# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Travis*, 2013 IL App (3d) 110170

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MONTA TRAVIS, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0170 |
| Filed | February 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A minor defendant's convictions and sentences for the first degree murder and armed robbery of an ice cream vendor were reversed and the cause was remanded for a new trial on the ground that his confession was involuntary, notwithstanding the facts that his needs were satisfied during his questioning, his mental capacity and intelligence were normal, he was familiar with the criminal processes, and the periods of questioning were brief, since he was young and impressionable, he was groggy when he was awakened for the session in which he confessed, no juvenile officer was present, and misleading promises of leniency were made based on his status as a juvenile. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 07-CF-1769; the Hon. Amy Bertani-Tomczak, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Gabrielle Green (argued), of State Appellate Defender's Office, of Ottawa, for appellant. |
| | |
| | James Glasgow, State's Attorney, of Joliet (Terry A. Mertel and Judith Z. Kelly (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Justices Lytton and Schmidt concurred in the judgment and opinion. |

## OPINION

¶ 1    The defendant, Monta Travis, was convicted of first degree (felony) murder (720 ILCS 5/9-1(a)(3) (West 2006)) and armed robbery (720 ILCS 5/18-2(a) (West 2006)), and was sentenced to concurrent prison terms of 45 years and 20 years, respectively. On appeal, the defendant argues that: (1) the circuit court erred when it failed to suppress the two unrecorded statements he gave to the police; (2) the court erred when it found that he voluntarily confessed to the police; and (3) his sentence was "void" because he was sentenced on both the felony murder charge and the offense underlying the felony murder charge, which entitles him to a new trial because his jury waiver was invalid. Based on our ruling that the defendant's confession was involuntarily given, we reverse the court's judgment and remand the cause for a new trial at which the defendant's recorded, fifth interview is to be suppressed.

¶ 2                                   FACTS

¶ 3    During the early afternoon hours of August 26, 2007, Manuel Villagomez, a husband and a father of four who was working as an ice cream vendor, was shot and killed while he pushed his ice cream cart down a residential street in Joliet. The following day, the then-15-year-old defendant was charged by complaint with Villagomez's murder.

¶ 4    On September 20, 2007, the defendant and Curtis Russell, Jr., were charged by indictment with three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(a)(3) (West 2006)) and one count of armed robbery (720 ILCS 5/18-2(a) (West 2006)). The indictment alleged that the defendant and Russell took money from Villagomez before shooting and killing him.

¶ 5    On September 29, 2009, the defendant filed an amended motion to suppress statements that he made to the police on August 26-27, 2007. In the motion, the defendant alleged that he gave five different statements to the police while at the Joliet police department on August 26-27, 2007, two of which were unrecorded and the last of which contained a confession.

The defendant argued that all of these statements should be suppressed.

¶ 6        The circuit court held a hearing on the defendant's motion on November 18, 2009.[1] The State presented the testimony of five Joliet police officers. Detective Joseph Egizio testified that he arrived at the scene of the shooting around 1 p.m. During his canvas of the neighborhood, a woman had told him that she saw a "Travis boy" in the area right before the shooting, who she clarified to be "Sandra's son." At approximately 5:32 p.m., Egizio returned to that woman's house, where she identified the defendant in a photo lineup as resembling "Sandra's son."

¶ 7        At approximately 5:37 p.m., Detectives Timothy Powers and John Ross drove in their unmarked vehicle to the scene of a traffic stop, where Officer Patrick Schumacher and his partner had stopped a vehicle in which the defendant was a passenger. Powers testified that he had been told that the defendant may have information on the homicide. Powers also said that there were at least four officers at the scene and possibly as many as eight.

¶ 8        Schumacher informed Powers that the defendant was willing to go to the Joliet police department to speak with the detectives. Powers and Ross then transported the defendant, who was not under arrest, in their unmarked vehicle to the Joliet police department.

¶ 9        After the three- to five-minute ride, the defendant was taken to an unlocked interview room. He was given some Gatorade to drink, and within 10 minutes, Powers and Ross reentered the room to ask the defendant some questions. They told the defendant they were investigating a shooting and they asked the defendant to recount his day. The defendant did not ask to leave and did not implicate himself during the approximately 20-minute interview. Powers testified that the defendant was free to leave at that point, but also stated that they never told the defendant that he was free to leave. This first interview was not recorded.

¶ 10       At approximately 6:37 p.m., Powers and Ross reentered the room. Ross testified that he began functioning as a juvenile officer at this second interview. They read a preprinted form to the defendant that contained his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), which Powers stated the defendant appeared to understand prior to waiving his rights by initialing and signing the form. Powers stated that they told the defendant that they had other information that indicated there were inconsistencies in the story the defendant gave during the first interview. The defendant proceeded to give the detectives another version of his actions that day and again did not implicate himself. At the request of the detectives, the defendant agreed to put his new version of events on videotape. The defendant did not say that he wanted to leave during this interview, and Powers said the defendant was not under arrest at that point. He and Ross also testified that they did not tell the defendant that he was free to leave after this unrecorded, second interview. Ross testified that after this interview, he provided a mattress and a blanket for the defendant because he requested something upon

_____

[1]We note that this was actually the second suppression hearing held in this case. The first suppression hearing was held on the defendant's motion to quash arrest and suppress evidence in which he argued that the stop of the vehicle containing the defendant constituted an unlawful seizure. Because there is no issue before us regarding the first suppression hearing, we refer to the second suppression hearing as "the suppression hearing."

which he could lie down. In addition, Ross testified that he did not call the defendant's mother, he only spoke to her in passing at the police station that night, and he did not ask the defendant if he wanted to speak to her.

¶ 11 The recorded, third interview was admitted into evidence and played at the hearing. The recording showed Powers and Ross enter the room and sit at the table, where the defendant, who was wrapped in a blanket, was already sitting. Powers stated that the time was 9:17 p.m. and then he read the defendant his *Miranda* rights. The defendant initialed and signed the form waiving those rights. Powers then asked the defendant a series of questions regarding his whereabouts during the day.

¶ 12 The defendant relayed to Powers a story that included him riding a bike through the neighborhood and briefly seeing Russell and the defendant's cousin, Jeremy Travis, down the block. The defendant said he saw Russell and Jeremy approach an ice cream vendor; Russell was alongside the vendor and Jeremy approached from the rear. The defendant continued riding past that location on his way to someone's house. As he was riding past a nearby school, he heard approximately three loud pops. He continued to ride toward his destination. The defendant said he had no contact with the ice cream vendor. He did not implicate himself during the interview, which ended at what Powers said on the video was 9:34 p.m.

¶ 13 Powers left the room and Ross asked the defendant whether he wanted any food or drink and whether he needed to use the restroom. The defendant asked Ross when he could go home. Ross told him, "we gotta see if all the stories jive, right?" Powers came back in shortly thereafter and told the defendant they had some information about two individuals being seen in the area exchanging something. Powers asked the defendant if he met up with anyone around that time, and the defendant said no.

¶ 14 Detectives Scott Nicodemus and Egizio testified that they interviewed the defendant's cousin, Jeremy Travis, at approximately 9:50 p.m. Jeremy implicated the defendant during that interview.

¶ 15 Powers also testified that the defendant gave two more recorded interviews. He was not involved with the defendant's recorded, fourth interview. This interview was conducted by Egizio around 10:50 p.m. Ross was also present and asked the defendant about food and using the restroom.

¶ 16 Egizio began the interview by telling the defendant that his version of events was "terrible" and was the "worst story you could have told." Egizio told the defendant that interviews they had done with other people "blew [the defendant's story] out of the water," and that Russell had said that the entire incident was the defendant's idea. Egizio also told the defendant that this was his last chance to "man up" and accept responsibility for his actions. As Egizio continued on, the defendant told Egizio to take him to jail because he would do his time and be back on the streets. Throughout the approximately nine-minute interview, the defendant denied involvement in the shooting. It ended when the defendant told Egizio that "I don't even want to talk to you no more." At that point, Egizio and Ross exited the room. As Egizio was leaving, he told the defendant to think about whether he would continue to sit there and be a child or whether he would "man up."

¶ 17    The recording continued to run after Egizio and Ross left the room. The defendant sat relatively motionless for approximately seven minutes before he put his head down on the table. Approximately 10 minutes later, Powers came in with food and a can of soda for the defendant and told him that they were going to be there for "a while." Powers asked whether the defendant wanted the mattress back; the defendant said yes. A few minutes later, Powers returned with the mattress. The defendant told Powers that he was tired. Powers left the room and the defendant lay down on the mattress around 11:21 p.m. Within about seven minutes, the defendant could be heard breathing heavier and eventually snoring.

¶ 18    At approximately 11:42 p.m., Powers and Nicodemus entered the room for a recorded, fifth interview. Powers testified that he knew when they walked in that the defendant had told Egizio that he did not want to talk to Egizio anymore. Powers also testified that he believed the defendant was under arrest at the time they entered the room for the fifth interview, although the defendant was not told he was under arrest. The recording was admitted into evidence and played at the hearing.

¶ 19    The videotape showed Powers wake the defendant, who then sat down in the chair and wrapped himself in the blanket. The defendant was visibly groggy. Powers asked the defendant if he was awake, to which the defendant responded affirmatively, and then Powers read the *Miranda* rights form to the defendant. The defendant initialed and signed the form, and Nicodemus began speaking. He spoke in a calm and civil tone and started by telling the defendant that when people yell at him, he gets defensive, so Nicodemus would not yell at him. During the interview, Nicodemus talked to the defendant about age and accepting responsibility for one's actions. Among other things, Nicodemus stated:

> "People make mistakes. You're a juvenile. Juvenile system's very forgiving, very understanding when people mess up. Crimes that you commit when you're a juvenile you're not even tried as an adult sometimes. You don't even get the maximum penalties. You don't even do that. Everybody gets a clean slate when they turn 17. You're lucky that you're less than 17, okay? But in order to get those breaks, to get those chances, you have to show some remorse, some compassion, and not just be somebody that doesn't have a conscious [*sic*], somebody that throws other people's names out there. You gotta be somebody that takes responsibility for their actions because if you don't do that, you're never gonna get any breaks. No one's ever gonna look at you as this kid's worth taking a chance on."

Later, Nicodemus stated:

> "So are you somebody that's worth us talking to? Or should we just walk out of here, go with the case we have, and let the State's attorney do what they want, just throw you in the system and let it take its course? I'm not ready to do that."

¶ 20    Nicodemus asked if the defendant was sorry for what happened that day. The defendant said yes. After Nicodemus talked more about taking responsibility and Powers commented, "you got family that you're gonna see when this is all done," the defendant asked, "[s]o, like, I can't go to the crib?" Nicodemus responded rhetorically, asking what the defendant thought should happen to someone who engages in actions like this.

¶ 21    Within a few minutes, the defendant confessed to shooting Villagomez. He said it was

an accident, as he did not know that the gun was cocked. After a few more comments, the defendant asked when they were going to take him to "River Valley." He said he told them what he did, and requested that they take him to "River Valley."

¶ 22   The defendant also said that the idea to rob Villagomez came from Russell. The defendant got the gun from Russell; he did not know whose gun it was and had never seen it before. The defendant was on a bike and rode up beside Villagomez while Russell approached from behind. The defendant said Russell did not tell him that the gun was cocked and that he thought it went off twice. After shooting Villagomez, he gave the gun to Russell and rode away. Russell followed on foot in the same direction, but they eventually took separate directions. He also stated that he had on the same clothes during the incident that he was wearing during the interview, which was a white T-shirt and long, dark-colored shorts. He stated that Russell was wearing a white T-shirt with blue jeans and a black hat.

¶ 23   The defendant asked again when he was going to be taken to "River Valley." Nicodemus stated, "[p]retty soon, we gotta call over there and make some reservations and stuff." They estimated it would be about an hour or an hour and a half. The defendant also asked about talking to his mother, and they told him that they would call her and let her know what was going on. The detectives left the room at approximately 12:09 a.m. Powers came back in about six minutes later to tell the defendant that his mother was on her way down to the police station.

¶ 24   Ross testified that he was not in the room for the recorded, fifth interview. He stated that he watched the interview on a monitor in another room.

¶ 25   Schumacher testified that he had arrested the defendant on a prior occasion in April 2006 for unlawful use of a weapon. In connection with that incident, the defendant was interviewed at the police station after having been read his *Miranda* rights, understanding them, and initialing and signing a waiver of those rights. Schumacher also stated that the defendant had been arrested approximately one week prior to that incident for criminal damage to a vehicle, although he was not interviewed in connection with that arrest.

¶ 26   The defense presented the testimony of Lysander Travis, who was the defendant's mother. She stated that she received a call from her cousin on August 26, 2007, who told her that the defendant had been arrested and was at the Joliet police department. She went to the police station around 5:30 or 6 p.m. She did not receive any call from the police prior to that time.

¶ 27   Once Lysander arrived at the police station, she inquired of the clerk whether they had the defendant. The clerk initially stated no, but double-checked and told Lysander approximately 10 minutes later that they did in fact have the defendant in the back of the police station. Approximately 5 to 10 minutes later, an officer came out and took Lysander to the back of the police station.[2] Lysander testified that she thought the officer was taking

---

[2]Egizio testified that he was the one who met with Lysander, took her to another room, and questioned her. Egizio also testified that it was approximately 7:30 or 8 p.m. when he met with Lysander, and he denied telling her when she was leaving the police station that the defendant would be released after they asked him some questions.

her back to see the defendant. She saw the defendant on a monitor as they walked through the police station. However, rather than taking her to see the defendant, he took her to an interview room instead, where he questioned her for approximately 20 minutes. Lysander stated that she did not explicitly ask to see the defendant, although she thought that she would be allowed to see him after her questioning was done. However, once the questioning was done, the officer gave Lysander his card and told her that the defendant would be released, but not until they were done questioning him. Lysander left the police station at approximately 7 p.m.

¶ 28    At approximately 9:30 p.m., the same officer and another officer went to Lysander's house and received her permission to search the defendant's room. The officer again told Lysander that the defendant would be released, but not until they were done questioning him.

¶ 29    At approximately 10:15 p.m., Lysander called the police station prior to her having to leave for work. She spoke to the officer who again told her that the defendant would be released, but he did not know when. He said he would call her when the defendant was being released. Lysander called the officer again around 11:30 p.m. or 12 a.m., and the officer did not answer. The officer did call Lysander around 1 a.m.; she asked if the defendant was being released and the officer told her no, that the defendant was being charged in connection with the shooting.

¶ 30    At the close of the hearing, the circuit court took the matter under advisement.

¶ 31    On January 8, 2010, the circuit court issued its decision. The court ruled that the defendant was not in custody at the time he was taken to the police station, given that he went voluntarily and was initially placed in an unlocked room. The court also found that: (1) the defendant showed in the videos an atypical familiarity with the criminal justice system for someone his age; (2) the time the defendant spent at the police station was not unusually long; and (3) the defendant had food and drink and was able to sleep for brief periods during his time in the investigation room. Based on the totality of the circumstances, the court ruled that there was no basis upon which to grant the defendant's motion to suppress.

¶ 32    In December 2010, the defendant waived his right to a jury trial and the case proceeded to a stipulated bench trial. Eighteen stipulations were introduced, including: (1) the testimony of Egizio, which would be consistent with his testimony at the prior motions hearings, including the suppression hearing, but included that the female witness told him "that minutes before the shooting she saw a subject she referred to as a 'Travis boy' on Grant Street along with another male black boy on a bicycle"; (2) the testimony of Schumacher, which would be consistent with his testimony at the suppression hearing; (3) testimony from a police officer who attended the autopsy on Villagomez, which would include that he took possession of two bullets recovered from Villagomez's body; (4) the testimony of a man who lived on the street on which the incident occurred who heard approximately five shots fired and who exited his house and saw Villagomez lying motionless on his stomach in the street; (5) the testimony of the woman who told Egizio about seeing the "Travis boy" at approximately 12:55 p.m. at the scene moments before the shooting occurred; (6) the testimony of an evidence technician who took photos and measurements of the scene and who collected evidence from the scene and from the hospital, with the latter being a bullet

from Villagomez; (7) the testimony of Powers, which would be consistent with his testimony at the prior motions hearings, including the suppression hearing; (8) the testimony of Ross, which would be consistent with his testimony at the suppression hearing; (9) the testimony of Nicodemus, which would be consistent with his testimony at the suppression hearing; and (10) the testimony of the defendant's cousin, Jeremy, which would include that he had seen the defendant with a .38-caliber revolver prior to August 26, 2007, and would also include that during his interview at the police station, he told the police:

> "he spoke with Monta Travis on August 26, 2007 by cell phone and recognized his voice and Monta Travis told him that he needed to not tell anybody about the shooting of the ice cream salesman or he would 'blow his noodles back' and that this meant he would blow his brains out."

Additional stipulations included: (11) the testimony of a firearms analysis expert, which would include that the three bullets recovered in this case were consistent with bullets fired from a .38-caliber revolver; (12) the testimony of a forensics pathology expert, which would include that he concurred with the findings of the coroner who performed the autopsy on Villagomez; (13) the testimony of the defendant's sister, Terika, which would be consistent with the interview she gave to an investigator in November 2007 in which she said she accompanied her mother, Lysander, to the police station on August 26, 2007, and that she believed the defendant would be released that night because the police told her that they would call when the defendant needed to be picked up; and (14) the testimony of the investigator who interviewed Terika and Lysander in November 2007, which would include that he interviewed Jeremy Travis in September 2010 and that Jeremy stated the defendant never threatened him prior to him speaking to the police on August 26, 2007. Attached to some of these stipulations were excerpts of transcripts from the hearings at which these individuals testified. In addition, the coroner's report was attached to the stipulation of the forensics pathology expert.

¶ 33 Also included in the stipulations was the testimony of the defendant's mother, Lysander, which would be consistent with her testimony at the suppression hearing and with the interview she gave to an investigator in November 2007. During that interview, she said, *inter alia*, that after she arrived at the police station at approximately 1:30 a.m. on August 27, 2007, she asked the police why they did not ask her permission to speak to her son. She said that a detective told her that "it did not appear that she (Ms. Travis) had a problem with the Detectives speaking to Monta when she first arrived at the Joliet Police Department on the evening of August 26, 2007."

¶ 34 The bench trial stipulations also included the testimony of two eyewitnesses. One consisted of a man who lived in the area in which the shooting occurred. This individual was in his semitruck on August 26, 2007, when he heard several gunshots. He looked outside and saw two African-American males coming from the direction of where he heard the shots. One male was running and the other was on a bicycle; both were proceeding down South Mississippi Avenue toward East 4th Avenue. The male on foot kept looking back toward the direction he was running from, and he was trying to catch up with the male on the bicycle. The two males stopped at the intersection of Mississippi Avenue and 4th Avenue and the male on the bicycle handed the other male something. Then, both males headed east down

4th Avenue. The eyewitness also would testify that he told police on August 26, 2007, that he could only provide a physical description of the male on foot; this male was wearing a white T-shirt with blue jean pants, and the male had medium length hair that was possibly braided.

¶ 35    The other eyewitness stipulation was from a man who also lived in the area in which the shooting occurred. In its entirety, the stipulation was as follows:

"1) That he witnessed the homicide at 355 Grant Avenue on August 26, 2007 at approximately 12:55 p.m.

2) That he was on the second floor deck of his residence at 313 Mississippi grilling food when he saw a Mexican ice cream vendor walking east on Grant from Union.

3) That 313 Mississippi is on the same block as 355 Grant Avenue and is east of Union Street on the northwest corner of Grant and Mississippi.

4) That he saw two male blacks walking behind the ice cream vendor–one on foot and the other on a bike.

5) That both subjects were wearing white t-shirts and blue jeans and had dark colored hair.

6) That they both appeared to be young teenagers approximately 13-14 years of age.

7) That he saw the male black subject on a bicycle approach the ice cream vendor on the north side of his ice cream cart and the male black subject on foot approach the ice cream cart from the south.

8) That it appeared they were having a conversation when he saw the ice cream vendor hand the male black subject on the bicycle some money and then saw the subject on the bike pull out a handgun and shoot the vendor approximately 3-4 times.

9) That both subjects then ran eastbound on Grant Street and then south on Mississippi Avenue.

10) That they both ran southbound on Mississippi and he lost sight of them.

11) That he was unable to get a good look at their faces."

¶ 36    At the close of the trial, the circuit court found the defendant guilty on all counts.

¶ 37    On March 4, 2011, the circuit court held a sentencing hearing. During the argument portion of the hearing, the prosecutor told the court:

"Monta Travis stands before you convicted of three counts of murder and armed robbery. Pursuant to an agreement that we had with the defense the State would be asking for a sentence in the range of 45 to 60 years. That agreement contemplated Mr. Travis' agreeing to do a stipulated bench trial in this matter."

When it pronounced its ruling, the court stated that it had considered, *inter alia*, "the sentencing range on the first degree murder of 45 to 60 agreed between the State and defense and six to 30 on the armed robbery." Without specifying which murder count, the court sentenced the defendant to 45 years of imprisonment for first degree murder, to be served concurrently to a 20-year sentence for armed robbery. The mittimus, which was dated the same day, indicates that the court entered judgment of conviction for first degree murder on

count III of the indictment (720 ILCS 5/9-1(a)(3) (West 2006)), as well as on the armed robbery count. The defendant appealed.

¶ 38                                    ANALYSIS

¶ 39     On appeal, the defendant argues that: (1) the circuit court erred when it failed to suppress the two unrecorded statements he gave to the police; (2) the court erred when it found that he voluntarily confessed to the police; and (3) his sentence was "void" because he was sentenced on both the felony murder charge and the offense underlying the felony murder charge, which entitles him to a new trial because his jury waiver was invalid.

¶ 40              I. THE DEFENDANT'S UNRECORDED STATEMENTS

¶ 41     First, the defendant argues that the circuit court erred when it failed to suppress the two unrecorded statements he gave to the police. Specifically, the defendant claims he was in custody at the time he gave his two unrecorded statements to police and, therefore, the applicable law prohibited their introduction into evidence and prohibited the introduction of the subsequent statements he gave to police.

¶ 42     On review from a circuit court's ruling on a motion to suppress, we defer to the court's credibility determinations and its findings of fact, and we will not disturb those findings unless they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). However, the court's ultimate legal ruling on the motion is reviewed *de novo*. *Slater*, 228 Ill. 2d at 149. In arriving at our decision, we consider not only the evidence presented at the suppression hearing, but also the evidence presented at trial. *Slater*, 228 Ill. 2d at 149.

¶ 43     In relevant part, section 5-401.5(b) of the Juvenile Court Act of 1987 (Act) provides:

"An oral *** statement of a minor who, at the time of the commission of the offense was under the age of 17 years, made as a result of a custodial interrogation conducted at a police station *** shall be presumed to be inadmissible as evidence against the minor in any criminal proceeding *** for an act that if committed by an adult would be brought under [the first degree murder statute] *** unless:

(1) an electronic recording is made of the custodial interrogation; and

(2) the recording is substantially accurate and not intentionally altered." 705 ILCS 405/5-401.5(b) (West 2006).

In addition, if a court finds that a violation of section 5-401.5(b) has occurred, "then any statements made by the minor during or following that non-recorded custodial interrogation, even if otherwise in compliance with this Section, are presumed to be inadmissible in any criminal proceeding *** against the minor except for the purposes of impeachment." 705 ILCS 405/5-401.5(d) (West 2006).

¶ 44     Section 5-401.5(a) of the Act defines a custodial interrogation as "any interrogation (i) during which a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response." 705 ILCS 405/5-401.5(a) (West 2006). Factors relevant to the

inquiry into whether an individual was in custody include:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Slater*, 228 Ill. 2d at 150.

¶ 45      In this case, the then-15-year-old defendant was a passenger in a vehicle that was stopped by police hours after the shooting death of Villagomez. During the stop, several more officers arrived at the scene, including Detectives Powers and Ross. The police asked the defendant if he would come down to the police station and answer some questions about his whereabouts that day. The defendant agreed to go and accepted an offer from Powers and Ross to transport him to the police station in their unmarked vehicle.

¶ 46      Once they arrived at the police station, which was near 6 p.m., the defendant was placed in an unlocked interview room and was questioned within approximately 10 minutes by Powers and Ross. The detectives told the defendant they were investigating a shooting and asked the defendant to recount his day, which he did. After interviewing the defendant for approximately 20 minutes, Powers and Ross left the room. They came back in shortly thereafter at 6:37 p.m.

¶ 47      For this second interview, Ross explained to the defendant that he was now serving as a juvenile officer. They read the defendant his *Miranda* rights, which Powers stated the defendant appeared to understand. The defendant waived his rights and agreed again to talk to the detectives. Powers told the defendant that they wanted to clear up some inconsistencies in what the defendant told them in the first interview. The defendant responded with another version of his day.

¶ 48      We believe that these circumstances support the circuit court's finding that the defendant was not in custody at the time he gave the two unrecorded statements. It is true that the defendant was only 15 years old and between four and eight officers were at the scene of the traffic stop. However, he voluntarily agreed to go to the police station to answer some questions regarding his day and to let Powers and Ross transport him to the police station in their unmarked vehicle. Once at the station, the defendant was placed in an unlocked room and interviewed by Powers and Ross within 10 minutes and for a brief period of time. The second interview occurred shortly thereafter and again was brief, with Powers conducting the interview and Ross serving as a juvenile officer. While the evidence was somewhat unclear as to the exact time the defendant's mother and sister arrived at the police station, there was no evidence that his mother asked to see him or vice-versa. Furthermore, there were no indicia of formal arrest, with the possible exception of the defendant being read his *Miranda* rights, although the reading of *Miranda* rights does not by itself create a custodial situation (see *People v. Vasquez*, 393 Ill. App. 3d 185, 192-93 (2009) (noting some rationale supporting the rule)). Moreover, Powers testified that the defendant appeared to understand those rights before he initialed and signed the waiver.

¶ 49      Contrary to the defendant's argument, even if the police considered the defendant to be

the "prime suspect" at the time the defendant agreed to go to the police station, that fact would not weigh in favor of a finding that the defendant was in custody during the unrecorded interviews. There is no evidence in the record that the police told the defendant that he was a suspect. See *Slater*, 228 Ill. 2d at 153 (noting that even if an officer has a subjective belief that an individual is a focus of an investigation, that fact does not impact the custody determination unless it was communicated to the individual via word or deed).

¶ 50 Under the totality of these particular circumstances, we hold that a reasonable person, innocent of any crime, would not have considered himself or herself to be in custody. See *Slater*, 228 Ill. 2d at 150. Because the defendant's two unrecorded interviews did not constitute custodial interrogations under section 5-401.5(a) of the Act, we hold that the circuit court did not err when it found that the defendant was not in custody at the time he gave the two unrecorded interviews.

¶ 51                      II. THE DEFENDANT'S RECORDED CONFESSION

¶ 52 Second, the defendant argues that the court erred when it found that he voluntarily confessed to the police. In support of his argument, the defendant contends that: (1) the police coerced the confession with promises of leniency; (2) the defendant was not afforded the opportunity to consult with a concerned adult prior to or during the interrogations; (3) his detention was lengthy and contributed to the creation of a coercive environment; and (4) the police did not scrupulously honor his *Miranda* rights.

¶ 53 When faced with a challenge to a circuit court's ruling on the voluntariness of a confession, a reviewing court will not disturb the circuit court's factual findings unless they are against the manifest weight of the evidence. *People v. Murdock*, 2012 IL 112362, ¶ 29. However, we review the court's ultimate ruling on whether a confession was voluntary under the *de novo* standard. *Murdock*, 2012 IL 112362, ¶ 29.

¶ 54 Our supreme court has long recognized that receiving a confession from a juvenile is "a sensitive concern." *People v. Prude*, 66 Ill. 2d 470, 476 (1977); see also *Murdock*, 2012 IL 112362, ¶ 32; *Haley v. Ohio*, 332 U.S. 596, 599-601 (1948) (commenting on why the propriety of interrogation methods can depend on whether the interrogated individual was a juvenile or an adult). In a seminal case often cited by Illinois courts of review, the United States Supreme Court has stated:

"If counsel was not present for some permissible reason when an admission [from a juvenile] was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. 1, 55 (1967).

When determining whether a juvenile's confession was voluntarily given, relevant considerations include: (1) the juvenile's "age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning"; (2) the duration of the detention, including whether the police physically or mentally abused the juvenile or employed trickery or deceit in obtaining the confession; and (3) whether the juvenile had an opportunity to speak with a parent or other concerned adult prior to or during

-12-

the interrogation, including whether the police prevented or frustrated such opportunities. *Murdock*, 2012 IL 112362, ¶¶ 30, 32, 45. No single factor is dispositive; rather, courts must consider the totality of the circumstances surrounding the confession. *Murdock*, 2012 IL 112362, ¶ 30; see also *People v. Prim*, 53 Ill. 2d 62, 70 (1972) (holding that the test for voluntariness of confessions "is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed").

¶ 55     In this case, the circuit court made no explicit credibility findings but made several factual findings regarding the evidence, none of which we have found to be against the manifest weight of the evidence. However, our *de novo* review of the court's legal rulings reveals that the court's decision with regard to the defendant's confession cannot stand given the applicable case law, including *Murdock*.

¶ 56          A. The Defendant's Age, Intelligence, Background, Experience, Education,
                       Mental Capacity, and Physical Condition

¶ 57     With regard to the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning, we note initially that the defendant was 15 years old, which is without a doubt an impressionable age that is a significant factor to consider with regard to the circumstances surrounding the defendant's confession. See, *e.g.*, *Haley*, 332 U.S. at 599-600; *People v. Griffin*, 327 Ill. App. 3d 538, 549 (2002).

¶ 58     With regard to the defendant's physical condition, we acknowledge that the evidence indicated that he was given food and drink and was allowed access to the restroom facilities. He appeared calm during the recorded, third interview, and appeared visibly uncomfortable during the recorded, fourth interview in which Egizio employed an aggressive and antagonistic style. For the recorded, fifth interview, the defendant was awakened by the detectives around 11:40 p.m. after napping on a mattress on the floor for less than 20 minutes. The defendant appeared groggy when he sat down in the chair, and he sat with his head and eyes pointed down while Nicodemus gave his narrative. We also note that there was evidence presented to indicate that the defendant, who was wearing a white T-shirt and what appeared to be long, dark-colored jean shorts, was cold at times in the interview room. At times, he wrapped himself in a blanket that the detectives provided for him.

¶ 59     The defendant asks us to consider that his presentence investigation report indicated that he had been attending an alternative high school. He also asks us to consider documents he presented for the first time at sentencing, which showed that at six years old, he tested in the "Mental Retardation range" and that in 2008 (with a reevaluation in 2011), he tested in the "mild mental impairment range" and was determined to have met the "mental retardation criteria" by his alternative high school. However, based on evidence presented at the sentencing hearing and at trial, especially the videotapes, the defendant appeared to understand the questions posed to him and was able to give full and clear answers to these questions. In addition, the videotapes indicated that he had no difficulty understanding his *Miranda* rights before he waived those rights. Based on that evidence, the defendant

-13-

appeared to be of normal intelligence and mental capacity for a 15-year-old. See *Murdock*, 2012 IL 112362, ¶ 44.

¶ 60    Additionally, some evidence was presented that the defendant had been arrested on two prior occasions and had some familiarity with the criminal investigation process. While we note that he did ask if he could go home after he confessed in the recorded, fifth interview, several minutes later he asked the detectives when he would be taken to "River Valley," which showed that the defendant was familiar with the River Valley Juvenile Detention Facility in Joliet. He followed that question with a statement that he had just told the detectives what he did, and said, "[t]ake me to River Valley." After further discussions with the detectives for approximately 12 minutes, the defendant again asked when he would be taken to River Valley. This evidence supports the circuit court's finding that the defendant had a familiarity with the criminal justice system not necessarily typical for someone his age.

¶ 61    B. The Duration of the Defendant's Detention, Including Whether the Police Used

Mental Abuse, Physical Abuse, or Deception

¶ 62    With regard to matters associated with the duration and nature of the defendant's detention, we can identify several problems that weigh toward a finding that the defendant's confession was involuntarily given.

¶ 63    With regard to the length of the defendant's detention, we note that the defendant arrived at the police station near 6 p.m. and was interviewed twice for relatively brief periods of approximately 20 minutes each between 6 and 7 p.m. At some point over a subsequent waiting period of approximately 2 hours and 15 minutes, the evidence indicated that the defendant took a nap for an unspecified amount of time. The defendant was interviewed a third time at approximately 9:17 p.m. for approximately 17 minutes. A fourth interview was conducted at approximately 10:50 p.m. and lasted for approximately nine minutes. Over the next approximately 40 minutes before the defendant was interviewed a fifth time, the police again provided a mattress and a blanket for the defendant. The defendant slept for at most 20 minutes before detectives Powers and Nicodemus entered the room at approximately 11:42 p.m. The defendant confessed during this fifth interview, which lasted approximately 27 minutes.

¶ 64    While the duration of the defendant's detention was somewhat lengthy, the interviews themselves were relatively brief. However, we note that the defendant had been sleeping for a brief time before the fifth interview was conducted. The defendant appeared to be groggy after the detectives woke him up around 11:42 p.m. and when he sat down in a chair at the table, he wrapped himself in a blanket. It is true that Powers had asked the defendant after he sat down if he was awake just prior to reading the *Miranda* form, but that question does not mitigate the significance of the defendant's visibly groggy condition. See generally *Murdock*, 2012 IL 112362, ¶ 47 (noting that sleep deprivation can lead to a potentially more coercive environment).

¶ 65    Furthermore, we believe the manner in which the police conducted the recorded, fifth interview weighs toward a finding that the defendant's confession was involuntarily given. Specifically, Nicodemus made misleading promises of leniency to the defendant during the

recorded, fifth interview. See, *e.g.*, *Murdock*, 2012 IL 112362, ¶ 30 ("[t]hreats or promises made by the police may be considered physical or mental abuse").

¶ 66    "To constitute an offer of leniency that renders a confession inadmissible, a police statement must be coupled with a suggestion of a specific benefit that will follow if the defendant confesses." *People v. Kellerman*, 342 Ill. App. 3d 1019, 1027 (2003); see also *People v. Wipfler*, 68 Ill. 2d 158, 173 (1977) (mere exhortations to tell the truth are permissible absent a suggestion of a specific benefit to the individual being interrogated). At the time of the defendant's offense, a juvenile who was at least 15 years old at the time of the offense and who was charged with first degree murder had to be tried as an adult. 705 ILCS 405/5-130(1)(a) (West 2006). While we acknowledge that the defendant had not been charged before he confessed and that it is the prosecutor who has the discretion to decide what charges to bring against an accused (*People v. Perry*, 224 Ill. 2d 312, 339 (2007)), we believe the clear import of Nicodemus's statements to the defendant was to assure him that he would remain in juvenile court no matter what crime he was charged with in connection with the shooting of Villagomez. Nicodemus stated to the defendant:

> "People make mistakes. You're a juvenile. Juvenile system's very forgiving, very understanding when people mess up. Crimes that you commit when you're a juvenile you're not even tried as an adult sometimes. You don't even get the maximum penalties. You don't even do that. Everybody gets a clean slate when they turn 17. You're lucky that you're less than 17, okay? But in order to get those breaks, to get those chances, you have to show some remorse, some compassion, and not just be somebody that doesn't have a conscious [*sic*], somebody that throws other people's names out there. You gotta be somebody that takes responsibility for their actions because if you don't do that, you're never gonna get any breaks. No one's ever gonna look at you as this kid's worth taking a chance on."

Significantly, Nicodemus's statement to the defendant that "[e]verybody gets a clean slate when they turn 17" indicated to the defendant that if he confessed to shooting Villagomez, he would receive some leniency as a juvenile. The videotape shows that these statements were not lost on the defendant, either, as he asked twice after confessing when he would be taken to the River Valley Juvenile Detention Facility in Joliet. Under these circumstances, we find that Nicodemus's misleading promises of leniency to the defendant during the recorded, fifth interview weigh in favor of a finding that the defendant's confession was involuntarily given.

¶ 67        C. Whether the Defendant Had an Opportunity to Speak With a Parent or
                Other Concerned Adult Prior to or During the Interrogation

¶ 68    With regard to whether the defendant had an opportunity to speak with a parent or other concerned adult prior to or during the interrogation, we note that it is undisputed that the police never asked the defendant if he wanted to talk to his mother, or vice-versa. It is also undisputed that defendant never asked to talk to his mother at any point prior to confessing to the homicide and that his mother never expressly asked to talk to the defendant. Nevertheless, Lysander showed her concern by coming to the police station shortly after she

-15-

was told by a relative that the defendant had been taken there. *In re R.T.*, 313 Ill. App. 3d 422, 430 (2000). Lysander testified that when an officer took her to the back of the station, she thought he was taking her to see the defendant. However, the officer took her to a separate room and interrogated her instead. She also testified that she was told several times during the night that the police would be releasing the defendant, although Egizio testified that he never said that to Lysander. Because there is conflicting evidence on this factor, we must conclude that the evidence regarding whether the defendant had an opportunity to speak to his mother neither weighs in favor of nor against a finding that the defendant's confession was involuntarily given.

¶ 69 Also included in the "concerned adult" category are juvenile officers. There is no requirement that a juvenile officer must be present when the police question a juvenile, but the presence of a juvenile officer or lack thereof is a significant factor in the analysis of whether a juvenile's confession was coerced. *Griffin*, 327 Ill. App. 3d at 547.

¶ 70 A conflict has arisen in Illinois case law regarding the role of a juvenile officer. *Murdock*, 2012 IL 112362, ¶ 49; *People v. Minniti*, 373 Ill. App. 3d 55, 73 (2007). Some cases have adopted a more passive role and required that the juvenile officer "verify that a juvenile's parents have been notified, ensure that the juvenile has been given *Miranda* rights, and ensure that the juvenile is properly treated, fed, given access to the restroom facilities, and not coerced." *Murdock*, 2012 IL 112362, ¶ 49; *People v. Williams*, 324 Ill. App. 3d 419, 429-30 (2001). Other cases have adopted a more active role and required that the juvenile officer "not merely be present and remain silent, but demonstrate an interest in the minors' welfare and affirmatively protect their rights." *Minniti*, 373 Ill. App. 3d at 73; *People v. McDaniel*, 326 Ill. App. 3d 771, 785 (2001). In *Murdock*, our supreme court acknowledged this conflict but declined to resolve it because its resolution was not essential to the disposition of the case. *Murdock*, 2012 IL 112362, ¶ 51. This was because the juvenile officer was also the lead investigator in the case; accordingly, our supreme court noted that there simply was no juvenile officer present in the room for that defendant's interrogation. *Murdock*, 2012 IL 112362, ¶ 51.

¶ 71 Our case is similar to *Murdock* not in the sense that Ross purported to serve as both an investigator and a juvenile officer, but because he was not present in the room at the time the defendant confessed. Like the court in *Murdock*, we are not faced with a situation in which we must choose which line of cases to follow regarding the proper role of a juvenile officer. *Murdock*, 2012 IL 112362, ¶ 51 ("[s]ince no juvenile officer was present in the room with defendant, we need not determine which line of appellate court decisions relating to the proper role of a juvenile officer is correct").

¶ 72 We believe that while Ross's presence in the room during the recorded, fifth interview was not required, it must be considered as a part of the totality of the circumstances. It is true that Ross testified that he was watching the interrogation on a monitor in a different room. However, there is nothing in the record to suggest that the defendant knew that Ross was watching the interrogation and, even if he did, we fail to see how that fact mitigates Ross's physical absence from the room under the circumstances of this case. Prior to the recorded, fifth interview, Ross had been present in the room for the previous three interviews and let the defendant know that he was serving as his juvenile officer for those interviews. The

-16-

videotapes showed that Ross did not participate in the questioning of the defendant during the recorded, third interview or the recorded, fourth interview, and there is no evidence to suggest that Ross participated in the questioning that occurred during the unrecorded, second interview, either. Then, with Ross absent, two detectives who were actively investigating the case, Nicodemus and Powers, entered the room to conduct the recorded, fifth interview, in which they were able to secure a confession from the defendant. Coupled with the aforementioned circumstances of the recorded, fifth interview, we find that the lack of a juvenile officer's presence in the room with the defendant during that interview weighs in favor of a finding that the defendant's confession was involuntarily given.

¶ 73                               D. The Totality of the Circumstances

¶ 74       Upon consideration of the totality of the circumstances as presented by this case, we hold that the defendant's confession during the recorded, fifth interview was involuntarily given. As we previously noted, no single factor is dispositive in the voluntariness determination. *Murdock*, 2012 IL 112362, ¶ 30. However, in this case, it is the unique combination of factors that, in the aggregate, weigh in favor of a ruling that the defendant's confession was involuntarily given. We acknowledge that the defendant's basic needs were generally met during his detention, that the testimony and videotapes indicated that he was of normal intelligence and mental capacity, that he had some familiarity with the criminal and juvenile processes, and that the interviews were relatively brief. Nevertheless, the defendant was of a young and impressionable age, he was groggy after being awakened by the detectives for a fifth interview, and he was not afforded a juvenile officer for that interview, unlike the previous three interviews. Further, and most importantly, Nicodemus made misleading promises of leniency to the defendant, whose questions about the River Valley Juvenile Detention Center in Joliet indicated that Nicodemus's promises weighed significantly in the defendant's decision to confess during the recorded, fifth interview. Under these circumstances, we hold that the defendant's confession was obtained in dereliction of the law and must be suppressed. See *In re V.L.T.*, 292 Ill. App. 3d 728, 736 (1997) ("[b]ecause a juvenile is 'an easy victim of the law,' her confession will be deemed inadmissible if an examination of the facts reveals that it was 'a confession wrung from a child by means which the law should not sanction' " (quoting *Haley*, 332 U.S. at 599, 601)).

¶ 75       We understand that this case presents extremely tragic circumstances. However, as we are a nation of laws, we are compelled under the law to reverse the circuit court's judgment and remand for a new trial at which the recorded, fifth interview of the defendant is to be suppressed.[3]

¶ 76                       III. "VOID" SENTENCE AND JURY WAIVER

¶ 77       Third, the defendant argues that his sentence is "void" because the circuit court convicted

---

[3]Our ruling on this issue obviates the need to address the defendant's argument that the police did not scrupulously honor his *Miranda* rights.

and sentenced him for both felony murder and the offense underlying the felony murder charge–namely, armed robbery. The defendant argues that the proper remedy for this error is to remand for a new trial because his waiver of his jury trial right was invalid. With regard to the latter alleged error, the defendant argues that his jury waiver was based on an agreement that was impossible for the State to meet and that was misleading as to the minimum and maximum sentences he faced. The defendant also alleges that he was not admonished as to the possible minimum and maximum sentences he faced.

¶ 78 We need not address either of the defendant's arguments with regard to these alleged errors. First, it is unnecessary to address his claim that his sentence was "void" because we are reversing his convictions and sentences and remanding the cause for a new trial. Second, it is unnecessary to address his claim that his jury waiver was invalid, as his jury waiver applied only to his first trial and does not apply to a new trial on remand. *People v. Bracey*, 213 Ill. 2d 265, 271 (2004); *People v. Mixon*, 271 Ill. App. 3d 999, 1002 (1994).

¶ 79                                  IV. DOUBLE JEOPARDY

¶ 80 Our holding that the defendant's confession should have been suppressed and that the defendant is entitled to a new trial raises double jeopardy concerns. *People v. Alfaro*, 386 Ill. App. 3d 271, 314 (2008). Accordingly, we must consider the sufficiency of the evidence to determine whether the double jeopardy clause prohibits the defendant's retrial. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008).

¶ 81 The double jeopardy clause will not prohibit the retrial of a defendant if an error in the proceedings caused the defendant's conviction to be set aside. *Lopez*, 229 Ill. 2d 322 at 367. The State may retry a defendant if a reviewing court determines that the evidence presented at trial–including the erroneously admitted evidence–was sufficient to convict the defendant. *Alfaro*, 386 Ill. App. 3d at 314. When considering the sufficiency of the evidence, we view the evidence presented in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *Lopez*, 229 Ill. 2d at 367.

¶ 82 In this case, the evidence presented at the stipulated bench trial consisted of 18 stipulations. Among these stipulations were the testimonies of several detectives who investigated the homicide and several eyewitnesses. Egizio interviewed a woman who saw the defendant and another young African-American male at the scene of the shooting just moments before it occurred. One eyewitness heard shots fired and observed the two boys fleeing from the area in which he heard the shots fired. One of the boys was on foot and the other was on a bike, and the boy on the bike handed something to the boy on foot, who was wearing a white T-shirt and blue jeans. Another eyewitness saw the shooting take place from the deck of his house. Two young African-American males approached the ice cream vendor; one boy was on a bike and pulled up alongside the vendor while the other male was on foot and approached from behind the vendor. The vendor handed the male on the bike money before the male pulled out a gun and shot the vendor three or four times. Both of the males were wearing white T-shirts and blue jeans. Cumulative to the above, the defendant confessed to shooting Villagomez, even though the video recording of the confession was

erroneously admitted. After considering all of the evidence in light of the appropriate standard, we hold that the evidence was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Accordingly, there is no bar to retrying the defendant.

¶ 83                                    CONCLUSION

¶ 84     The judgment of the circuit court of Will County is reversed and the cause is remanded for a new trial at which the recorded, fifth interview of the defendant is to be suppressed.

¶ 85     Reversed and remanded.