2022 IL App (2d) 210325-U
No. 2-21-0325
Order filed October 17, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-210 |
| GERALD COOK, | ) ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant failed to establish on appeal that sleep deprivation rendered involuntary his confession to possessing various drugs in his apartment.

¶ 2   Defendant, Gerald Cook, was indicted on charges of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A), (a)(7)(B), (c)(2), (c)(7)(i) (West 2016)) (counts I, III, VIII, XI), unlawful possession of a controlled substance (*id.* §§ 402(a)(2)(A), (a)(7)(B)(i), (c)) (counts II, IV, IX, XII, XIII, XIV, XV, XVI), unlawful possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(1) (West 2016)) (count V), unlawful possession of methamphetamine (*id.* § 60(a)) (count VI), and unlawful possession of a controlled

substance with intent to deliver within 1000 feet of a public park (720 ILCS 570/407(b)(1) (West 2016) (counts VII, X). The State based the charges on (1) evidence discovered during the execution of a search warrant at defendant's apartment and (2) statements defendant made to police during four interviews. Defendant unsuccessfully moved to suppress his statements. The matter proceeded to a stipulated bench trial on counts I through VI and counts VIII and IX[1], and the trial court found defendant guilty of all the charges. The court entered judgments of conviction on counts I, III, V, and VIII, finding that the other charges merged into those counts. The court sentenced defendant to an 11-year prison term, and this appeal followed. Defendant argues that the trial court should have suppressed his statements during the third and fourth interviews for being involuntary because he was suffering from sleep deprivation. We affirm.

¶ 3                                I. BACKGROUND

¶ 4     At the hearing on defendant's motion to suppress, Kriss Mecca, a De Kalb Police Department detective, testified that at around noon on March 21, 2017, he assisted in the execution of separate warrants for searches of first and second-floor apartments in the same building. Officers found defendant and Katie MacAdam inside the second-floor apartment. Mecca believed defendant was in his mid-30s. Defendant was out of breath and sweating profusely. Mecca cuffed defendant's hands in front of his body, had him sit in a chair, and advised him of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant stated that he understood, and he agreed to speak with Mecca. Defendant did not slur his speech. Based on Mecca's experience, defendant did not appear to be under the influence. Mecca also noted that defendant had one or more felony convictions and had served time in the Department of Corrections.

---

[1]The State dismissed the remaining counts of the indictment.

¶ 5        Mecca advised defendant that the police were looking for cannabis and methamphetamine. Defendant responded, " 'There's not any weed in here.' "  Defendant told Mecca that he had recently returned from Chicago, had taken a shower, and was about to sleep.  Mecca continued the interview, which lasted about 45 minutes.  Mecca asked defendant if he was under the influence of anything and when he last used methamphetamine.   Defendant said he had used methamphetamine the previous night with his girlfriend.  Defendant denied being high on anything currently.

¶ 6        The officers conducting the search found a safe.  Defendant admitted that the safe belonged to him and said, " 'That's your jackpot.' "  Defendant indicated that one of the items in the safe was a bag of cocaine that he was holding for a friend who had just purchased it.

¶ 7        Defendant was taken to the police department and placed in an interview room.  Shortly after 2 p.m., Mecca interviewed defendant.   Defendant and Mecca initially talked about defendant's methamphetamine habit and where he obtained the drug.  Defendant's responses to the questioning were appropriate.  Defendant gave the police written permission to search his cell phone.  Defendant had "made a statement about wanting to allow [the search] if it would help him out."  Mecca "responded something to the effect that [he] could not make him any promises, [he] can only show it's going to show his cooperation."  Nevertheless, defendant consented to a search of the phone.  He also gave the police written permission to search his vehicle.

¶ 8        The interview took approximately one hour.  The police (1) offered defendant water, (2) gave him a blanket, (3) allowed him to use the restroom, and (4) later offered him food.  In Mecca's opinion, defendant's mannerisms and ability to understand and respond to questions were the same in the first and second interviews.

¶ 9    After the second interview, Mecca left defendant in the interview room while Mecca assisted with field testing and analysis of evidence recovered during the search. The process took two or three hours and revealed the presence of controlled substances that defendant had not mentioned. When Mecca finished, he returned to the interview room with his supervisor, Sergeant Jeff Weese. They told defendant that they did not believe that defendant was being honest with them. Defendant acknowledged that there was other contraband at the apartment. They proceeded to discuss what the police had discovered in the search. Defendant was able to answer their questions appropriately. Defendant explained that he had LSD (lysergic acid diethylamide) and had sold some recently. However, he indicated that he sold more during the "summer festival season." The third interview lasted between an hour and an hour and a half. Mecca saw no indications that defendant was under the influence of drugs or alcohol during that interview.

¶ 10    At the end of the interview, defendant agreed to make a video-recorded statement about what they had discussed. Mecca activated the recording equipment at 7:26 p.m., slightly more than seven hours after the police entered the apartment where they encountered defendant. When Mecca returned to the interview room, he noticed that defendant had laid his head on the table and was covered with a blanket.

¶ 11    Weese testified that defendant appeared normal when Weese encountered him while searching the apartment. He did not appear to be under the influence and responded appropriately to Weese's questions. When Weese spoke with defendant in the interview room at the police department, defendant seemed normal, and his answers were responsive to the questions asked. Weese recalled that defendant appeared to be very tired but was coherent.

¶ 12    The video-recorded interview was admitted into evidence and is included in the record on appeal. At the beginning of the recording, defendant is lying with his head on a table and a blanket

covering his back and shoulders. He was lightly snoring. Before entering the room, Mecca asked defendant if he was awake. Defendant responded, "Mm-hmm." Next, Mecca asked if he could talk to defendant. Defendant responded, "Mmm." Mecca asked defendant to sit up, and he complied. Mecca then advised defendant that the exchange was being recorded and asked for defendant's permission to record the interview. Defendant responded, "Mmm." Mecca then asked defendant if he was awake and "good to do this right now." Defendant responded, "Uh." Mecca asked defendant to spell his name and state his date of birth. Defendant spelled his name correctly and said his date of birth was November 7, 1980.

¶ 13    Defendant indicated that he remembered being advised of his *Miranda* rights and understood that they still applied. Asked whether he was still willing to speak with Mecca, defendant replied, "Um, yeah." Mecca then asked defendant, "Are you sure you're okay with that." Defendant responded, "I think so. I'm really torn by it; I don't know what to do. I'm trying to do the best thing possible for myself." Defendant admitted keeping in his living room safe some "stuff" that he was not supposed to have. After being asked what was in the safe, defendant began to mumble. Mecca then asked what the first thing defendant remembered having in the safe was. Defendant responded, "I'm sorry if I've been daydreaming," and then explained that there was LSD in the safe. The LSD was in blotter and in liquid form. Defendant explained that he sometimes used the LSD himself but also held some for the summer when people were more interested in buying it.

¶ 14    Defendant also kept in the safe Ativan (lorazepam), Adderall, cocaine, "sassafras" (3,4-Methylenedioxyamphetamine, or MDA) capsules, heroin, and hydrocodone. He took Ativan for anxiety and Adderall when he did not have methamphetamine. The cocaine was intended for sale. When asked how much he intended to make by selling the cocaine, defendant mumbled briefly

and then asked Mecca to repeat the question. Defendant also kept the heroin for sale. He kept the methamphetamine for personal use and sale. When asked if there was anything else in the safe, defendant responded, "My brain's retarded." Mecca then asked if there was Percocet in the safe. Defendant said that there was, and that he used it for pain or to help him sleep.

¶ 15    Mecca asked defendant about a Nike box in the attic. Defendant explained that he kept glass pipes in the box. Defendant was unaware of the blotters that the police discovered in the box. He indicated that MacAdam stole them from him and that the box was her hiding spot. Defendant became emotional when Mecca mentioned MacAdam's "personal demons." Defendant said that he would do anything for MacAdam. Mecca said, "We want to try to see how we can get past this." Mecca added that "sometimes jail is the answer," but he indicated that he was not making any predictions or promises. Defendant stated that he "just wanted to come clean with this." He wanted to "move forward" and "be clean and sober." Mecca asked if defendant felt that Mecca treated him fairly. Defendant responded, "Yes, you have." Defendant also acknowledged that Mecca had not made any explicit promises to defendant or threatened him. After offering defendant an opportunity to use the restroom, Mecca left the interview room and returned with a bag of food from McDonalds. Defendant again became emotional and asked if MacAdam was okay. Mecca responded that MacAdam was okay and that she had been getting blankets, water, and restroom access.

¶ 16    Defendant testified that he recalled police officers executing a search warrant at his apartment on March 21, 2017. At the time of the search, he had been using methamphetamine continuously and had not slept for seven days. Defendant was at his brother's house between 3 a.m. and 4 a.m. on the day of the search. While there, he drank whiskey and used methamphetamine. He took lorazepam before leaving his brother's home at around 10:30 a.m. or

11 a.m. He took Percocet and "smoked some weed" on the way home. Defendant had just taken a shower and was in his bedroom when police executed the warrant.

¶ 17 Defendant remembered the interview in the apartment, but not in detail. He was tired and was planning to go to bed. He remembered being taken out of the apartment in handcuffs but did not remember riding to the police department. His next memory was being told he would be transported to the county jail. Defendant started to get tired and sleepy because he had not used methamphetamine since before his shower and needed sleep.

In closing argument, defense counsel maintained that defendant was intoxicated throughout his encounter with the police and that his intoxication was apparent in the video-recorded fourth interview. Counsel argued that defendant's statements were not voluntary. The trial court found that, although it was clear from defendant's testimony that he had been using drugs and alcohol, the court found defendant was not so grossly intoxicated that he lacked the capacity to knowingly waive his rights. The court therefore denied the motion to suppress.

¶ 18                                              II. ANALYSIS

¶ 19 Defendant does not dispute the admissibility of his statements during the first two police interviews. However, he argues that the trial court erred in concluding that his statements during the third and fourth interviews were voluntary. Thus, according to defendant, the trial court should have suppressed those statements. Defendant focuses almost entirely on his condition during the video-recorded fourth interview. He argues that it is reasonable to infer that he was in a similar condition during the third interview.

¶ 20 Our supreme court has observed:

"To determine the voluntariness of a confession, courts consider the totality of the circumstances, including such factors as the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning. [Citation.] Other factors include the duration and legality of the detention and whether there was any physical or mental abuse by the police. [Citation.] Threats or promises made by the police may be considered physical or mental abuse. [Citation.] No single factor is dispositive, rather '[t]he test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession.' " *People v. Murdock*, 2012 IL 112362, ¶ 30 (quoting *People v. Morgan*, 197 Ill. 2d 404, 437 (2001)).

¶ 21    When reviewing a trial court's ruling on the voluntariness of a confession, we will reverse the trial court's factual findings only if they are against the manifest weight of the evidence. *Morgan*, 197 Ill. 2d at 437. "However, a trial court's ruling on the ultimate question of whether the confession was voluntary is reviewed *de novo*." *Id.*

¶ 22    Although the manifest-weight standard is highly deferential to the trial court (*People v. Guerrero*, 2012 IL 112020, ¶ 19), defendant contends that "the reviewing court gives less deference to factual findings based on nontestimonial evidence (such as video exhibits admitted into evidence) because unlike live witness testimony, a trial court does not occupy a position superior to the reviewing court in evaluating video evidence." See, *e.g., People v. Lozano*, 2022 IL App (1st) 182170, ¶ 31. The State responds that the principle does not apply here, because the trial court "based its factual findings on the testimonies of defendant, Detective Kris Mecca and Sergeant Jeff Weese, with some references to [defendant's recorded statement]." The dispute appears to be purely academic, however, because other than the trial court's ultimate determination

that defendant's confession was voluntary (which we review *de novo* in any event), it is unclear which of the trial court's specific findings defendant disputes based on the video recording of defendant's interview.

¶ 23    The thrust of defendant's argument does not appear to be that the trial court's factual findings were incorrect but, rather, that the trial court based its decision on the wrong legal principles.  According to defendant, the trial court applied case law governing the voluntariness of confessions by intoxicated individuals, rather than those suffering from sleep deprivation.  In *People v. Sleboda*, 166 Ill. App. 3d 42, 51 (1988), we held that "evidence of intoxication by itself will not render a waiver involuntary. [Citation.]  Rather, the evidence must plainly show that a defendant is so grossly intoxicated that he no longer has the capacity to knowingly waive his rights."  If, despite intoxication, a defendant is coherent, the court may find that the defendant has the requisite capacity. *People v. Garcia*, 165 Ill. 2d 409, 423 (1995).  Here, according to defendant, the trial court found that, because defendant gave coherent answers during the recorded interview, he did not make the necessary showing for suppressing a confession based on intoxication. Defendant protests that the trial court should have considered whether the sleep deprivation caused by methamphetamine use rendered his statements involuntary because the stimulant effect of the drug had worn off by the time he participated in that interview.  Defendant maintains that the proper analysis requires consideration of the totality of the circumstances, which includes, as a prominent factor, a defendant's lack of sleep when interrogated by police.

¶ 24    The trial court's focus on the effects of defendant's intoxication is not surprising, given that that was the focus of defendant's argument below.  It does not appear that defendant argued that sleep deprivation, *in itself*, rendered his statements involuntary.  Indeed, by failing to make that argument, defendant conceivably forfeited the issue.  See, *e.g.*, *In re Ronald J.*, 2017 IL App

(4th) 160855, ¶ 22. However, because the State does not argue that the issue was forfeited, we will address it on the merits. See *People v. Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46 ("The rules of waiver also apply to the State, and where, as here, the State fails to argue that defendant has forfeited the issue, it has waived the forfeiture.").

¶ 25    Notably, defendant does not appear to argue that a person's ability to answer questions coherently is irrelevant when assessing whether sleep deprivation was a factor negating the voluntariness of a confession. Sleep deprivation and the use of intoxicating substances both affect mental functioning. Thus, extreme sleep deprivation, like extreme intoxication, could potentially destroy the defendant's capacity to make a voluntary waiver of rights. In either case, the defendant's coherence (or lack thereof) bears on the issues of capacity and voluntariness.

¶ 26    However, defendant does not focus on how sleep deprivation affected *his capacity* to waive his rights. Rather, defendant stresses another aspect of sleep deprivation: that it "can lead to a potentially more coercive environment." *People v. Murdock*, 2012 IL 112362, ¶ 47. In this respect, given that various circumstances contribute to the overall coerciveness of an interview environment, defendant correctly emphasizes that the issue of voluntariness depends on the totality of the circumstances. A case cited by defendant, *People v. Travis*, 2013 IL App (3d) 110170, provides a good illustration. In finding the minor defendant's confession inadmissible, the *Travis* court commented on the defendant's physical condition. The court noted that the defendant had been napping on a mattress on the floor before the police woke him at 11:40 p.m. to conduct an interview (which was his fifth one that day). In addition, the defendant appeared to be "groggy" (*id.* ¶ 58), and the court noted the relationship between sleep deprivation and the coerciveness of the interview environment (*id.* ¶ 64 (citing *Murdock*, 2012 IL 112362, ¶ 47). However, other factors contributing to the coerciveness of the interrogation included (1) the defendant's

impressionable age (15 years old), (2) the "aggressive and antagonistic style" (*id.* ¶ 58) in which the previous (*i.e.*, fourth) interview was conducted, (3) misleading promises of leniency during the final interview (*id.* ¶ 65), and (4) the absence of a concerned adult during the interview in which the defendant confessed (*id.* ¶ 72).

¶ 27    In his reply brief, defendant acknowledges that *Travis* is not factually similar to this case; he cited it "for the proposition that a defendant's groggy condition can weigh toward a finding of involuntariness." Nonetheless, defendant's citation to *Travis*, and his insistence that voluntariness depends on the totality of the circumstances, underscores his failure to meaningfully address any circumstance other than sleep deprivation. Here, defendant was an adult and, therefore, less susceptible to coercion than the minor defendant in *Travis*. Moreover, defendant does not claim that his intelligence, background, experience, education, or mental capacity militate against the conclusion that his confession was voluntary. Nor was defendant's detention exceedingly lengthy. See *People v. Ward*, 302 Ill. App. 3d 550, 561 (1998) (a nearly 48-hour detention did not heavily favor the defendant's contention that his statement was coerced). Moreover, there was no evidence (including the video-recorded interview) suggesting that the questioning was aggressive or hostile or that any threats or promises were made to secure defendant's confession.

¶ 28    Accordingly, we conclude that defendant's statements during the fourth interview were voluntary. As noted, defendant bases his argument—that his statements during the third interview were involuntary—on the inference that defendant was in the same condition of sleep deprivation during both interviews, which occurred close in time. Because defendant's condition during the fourth interview does not warrant a finding of involuntariness, we likewise decline to find that defendant's statements during the third interview were involuntary. Therefore, the denial of defendant's motion to suppress was not error.

¶ 29                                  III. CONCLUSION

¶ 30    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 31    Affirmed.