# Illinois Official Reports

## Appellate Court

---

### *People v. O'Neal*, 2021 IL App (4th) 200014

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RYAN H.J. O'NEAL, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-20-0014 |
| Filed | July 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 15-CF-1122; the Hon. Thomas E. Griffith Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Catherine K. Hart, and Salome Kiwara-Wilson, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Scott Rueter, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE DeARMOND delivered the judgment of the court, with opinion.<br>Presiding Justice Knecht and Justice Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1 In August 2019, following a bench trial, the court found defendant, Ryan H.J. O'Neal, guilty of one count of first degree murder (felony murder while armed with a firearm) (720 ILCS 5/9-1(a)(3) (West 2014); 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2014)) and two counts of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2014)). The trial court sentenced defendant to 24 years in the Illinois Department of Corrections (DOC) followed by 3 years' mandatory supervised release (MSR).

¶ 2 In this appeal, defendant raises three issues relating to his conviction and sentence: (1) the trial court erred in denying defendant's motion to suppress his statements to police because he did not knowingly and intelligently waive his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and his statements were involuntary, (2) the Illinois felony murder statute is unconstitutional as applied to him because he was a juvenile when he committed his crimes, and (3) the trial court erred by sentencing defendant to 24 years in DOC while his more culpable codefendant received a 20-year sentence. We disagree and affirm the trial court's judgment.

## I. BACKGROUND

¶ 3

¶ 4 Cesley Taylor and her fiancée, Britney Wilson, spent Labor Day 2015 at the beach in Shelbyville with Britney's family. As they returned to their Decatur apartment that evening, they spotted defendant exiting a vehicle near the apartment complex entrance. The women picked up defendant and drove him to their apartment because Cesley had made plans to shoot dice with him and Daiquan Cline. The three entered the small, one-bedroom apartment, and Britney went to lie down in the bedroom while Cesley and defendant began shooting dice. What the women did not know, however, was that defendant, Cline, and two others planned to rob the dice game, believing Cesley had on hand $2000. According to their plan, defendant texted Cline to tell him when Britney went to the bedroom and he and Cesley were alone. Minutes later, Cline and his cohorts knocked on the door. When Cesley asked who it was, Cline announced himself. She opened the door to let him in but was confused to see others with him and asked "what was going on." Just then the two other masked men—Darion Evans and Shaitan Cook Jr.—entered the apartment, pulled out guns, and demanded money from Cesley. As part of the plan and ruse that defendant was an unknowing victim to an unsuspected robbery, he asked the men why they were doing this and handed over his money. When Cesley initially said she did not have money, Cook went to the bedroom and demanded money from Britney. Eventually Evans grabbed money from Cesley's hand and forced her to the bedroom as he and Cook held the women at gunpoint, still demanding more money. Defendant and Cline, meanwhile, gathered Cesley's shoes, her iPhone and charger, a small purse, and some cash. Upon hearing multiple gunshots, defendant and Cline ran out of the apartment, followed quickly by Evans and Cook.

¶ 5 The men ran to Cline's car parked nearby and drove around. They stopped three times, once to switch drivers, once to throw Cesley's iPhone into a pond, and once to divide their spoils. While at a park, the men divvied up the money (approximately $40 in one-dollar bills) and disposed of the small purse and its contents, including Cesley's ID. Then the men dispersed and went to their respective homes.

¶ 6		Meanwhile, Britney staggered from the bedroom, trailing blood along the way, looking for the cell phone she shared with Cesley. When she could not find it, she banged on a neighbor's door for help. When police arrived, they found Britney on the ground outside the apartment. She appeared "[v]ery sick[,] [s]he was throwing up, and she also had a lot of blood on her." The police followed the blood trail into the apartment looking for other victims. They found Cesley in the bedroom. She was unresponsive, not breathing, and later pronounced dead at the scene. Britney was taken to Decatur Memorial Hospital and then Carle Foundation Hospital for treatment of multiple gunshot wounds.

¶ 7		The next morning, September 8, 2015, per a request from law enforcement, the resource officer at Decatur Eisenhower High School removed defendant from his classroom and transported him to the Decatur Police Department for questioning. Police had learned from Britney that defendant was shooting dice with Cesley in the women's apartment before the robbery. The officer handed defendant over to Detective Ronald Borowczyk, who was acting as defendant's designated juvenile officer (DJO), at approximately 10:45 a.m. Defendant's interactions with Borowczyk and other law enforcement personnel were video recorded. The recording begins with Borowczyk getting defendant's address and phone number and asking who he can contact for defendant. Defendant says Borowczyk can contact his mother, Rotasha Ridley. Borowczyk left the room and returned about five minutes later with Detective Brian Kaylor. Borowczyk identified Kaylor as a detective with the Decatur police, and defendant nodded affirmatively like he understood. Kaylor, with Borowczyk sitting in the room observing defendant, read defendant his *Miranda* rights from the form titled "Custodial Interview Advice Juvenile." Kaylor told defendant he could read along and confirmed defendant could read. The video shows Kaylor turned the paper around so defendant could follow along, and it appeared defendant did read along. After Kaylor read a right or group of rights, he stopped and asked defendant some variation of the question "does that make sense" or "do you understand," and each time defendant affirmed he understood what was read to him. When Kaylor asked defendant to initial and sign the form, defendant asked where he should put his initials. Kaylor explained again that by initialing defendant was confirming the rights were read to him and by him and he understood those rights. Defendant then initialed next to each advisement and signed the rights form.

¶ 8		Once he did so, Borowczyk said to defendant, while maintaining eye contact with him: "If you have any questions or anything like that while, uh, Detective Kaylor is talking to you, just let him know and he can come get me, okay?" Still looking at Borowczyk, defendant nodded affirmatively, indicating he understood. Borowczyk then left the room as Kaylor began asking defendant about his cell phone number.

¶ 9		Kaylor began the interrogation by informing defendant his name came up in the Cesley Taylor investigation and said: "Let me just explain this to you, your honesty can take you real far here, okay?" Defendant said he would be honest, and Kaylor allowed him to tell him what happened the night before. Over the next 20 minutes or so, defendant told multiple versions of what happened in Cesley and Britney's apartment. His stories varied from denying being at the apartment, to denying knowing who entered the apartment, to naming everyone who came in, and to knowing Cline and the others came to rob the dice game.

¶ 10		During this time, Kaylor often stopped defendant to ask for clarification or for more detail, and then he usually had defendant start again from the beginning. He confronted defendant when he believed defendant was being dishonest or hiding something. Kaylor employed

various interrogation tactics during the interview: he implored defendant to be honest, he said he would leave the interrogation if defendant kept lying, he told defendant this was his one chance to be honest and explain himself, he reminded defendant that his "good friend" was dead, he reminded defendant that Britney survived and was talking to police, he said the police knew more than defendant thought they knew, he asked defendant if he wanted to go home or go to jail, he told defendant that talking with police made him "a witness" and not "a rat," and he encouraged defendant "to be brave" and "put on some big-boy pants." Kaylor eventually told defendant he would have "to ask yourself, how involved do you want to be, *** do you want to be a witness, or do you want to be a defendant?" When defendant clarified, "by defendant you mean I was part of it, like I was?" Kaylor interrupted, "yes, okay, so defendant means is that you'd be basically fighting for your life in court. Or do you want to be a witness?" As Kaylor asked defendant more questions, defendant slowly divulged more information. The two kept talking until Borowczyk knocked on the door, entered, and said:

> "BOROWCYZK: (Looking at defendant) Your mother is here.
>
> DEFENDANT: (Looking at Borowczyk, nodding affirmatively, indicating he understood).
>
> KAYLOR: Do you want her in here?
>
> DEFENDANT: (Looking down, shaking his head, indicating no).
>
> BOROWCYZK: No? Okay. (walked out and closed door)"

The interrogation continued, and defendant eventually admitted he knew Cline and others intended to come to the apartment to rob the dice game, but he did not know they were going to kill Cesley. Once he admitted this, defendant said: "Oh my god, *** I'm fitt'n [*sic*] to go to jail." Kaylor assured defendant he was "doing the right thing." To which defendant responded, "No I'm not, cuz [*sic*] y'all going to take me to jail regardless." As Kaylor explained what he would have defendant do next (look at pictures of suspects and look at a diagram of the apartment to show where people were), defendant asked, "[A]m I going to jail?" Kaylor answered, "I'm not making that decision, but I'm on your team at this point." To which defendant said, "No you're not." After reassuring defendant, Kaylor left defendant alone in the interrogation room.

¶ 11    Defendant remained at the police station for the next 12 hours or so. Once defendant requested his mother or his grandmother be present, one of them sat in during questioning. When in the room, defendant's mother told him that if he was in the apartment then please tell the police what he saw. She told him his friends were not helping him. Defendant identified suspects in photo lineups, and the police recorded his fingerprints and took deoxyribonucleic acid (DNA) samples. Defendant was allowed to eat, use the restroom, and use his mother's and grandmother's cell phones. Defendant was shackled and handcuffed only when he left the station with police to identify where some of the cohorts lived. All told, he was restrained for about 45 minutes. Over the course of the 12 hours in the police station, Kaylor and other detectives entered and reentered the interrogation room for brief questioning. They often confronted defendant with information they learned from other suspects, witnesses, and social media. Kaylor continued to implore defendant to be honest and reminded defendant he was a witness to a murder. Defendant eventually acknowledged much of what he initially told police were lies. He ultimately admitted he knew of the plan to rob the dice game, he took some items from the apartment, he left with Cline and the others in Cline's car, and he received money from the robbery. At approximately 11:40 p.m., defendant refused to answer any more

questions. Police did not attempt to ask him any more questions. In the early morning hours of September 9, 2015, defendant was transported to a juvenile detention center in Peoria, Illinois.

¶ 12 The State charged defendant with seven counts, including three counts of first degree murder while armed with a firearm, a Class M felony (720 ILCS 5/9-1(a)(1) (West 2014); 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2014)); one count of felony murder, a Class M felony (720 ILCS 5/9-1(a)(3); 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2014)); one count of attempt (first degree murder), a Class X felony (720 ILCS 5/8-4(a), (c)(1)(B) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014)); and two counts of armed robbery, a Class X felony (720 ILCS 5/18-2(a)(2), (b) (West 2014)). The defense moved to suppress defendant's statements to police, alleging various reasons for suppression, including: (1) defendant was 16 years old at the time, (2) defendant's mental and psychological capacity was diminished due to lack of sleep, (3) there was no juvenile officer or adult present to protect defendant's interests, (4) the *Miranda* warnings were ineffectively given and there was no indication defendant understood his *Miranda* rights and no indication he had knowledge of the consequences of waiving his *Miranda* rights, (5) defendant's mother was not immediately notified of defendant's detention by police, and (6) defendant's mother was initially denied access to her son for one hour.

¶ 13 The trial court held a suppression hearing in January 2019. The State presented testimony from law enforcement, including Borowczyk and Kaylor. The State also entered into evidence digital video discs (DVDs) of defendant's interrogation, the juvenile custodial advice form that defendant initialed and signed, and defendant's mother's affidavit. The court admitted the exhibits without objection. The defense presented testimony from defendant's mother, Ridley. The trial court took the matter under advisement, telling the parties it would view the videotape before rendering a decision.

¶ 14 On January 29, 2019, the parties and the trial court reconvened for the court's decision. Neither party had additional evidence to present, and defendant affirmed his decision not to testify. Following the arguments of counsel, the trial court denied defendant's motion to suppress. The court explained the rationale for its decision, saying:

"The defendant, at the time of his statement was almost 17-years of age. I think he was about 16 and three-quarters. He is very articulate. He appeared to be intelligent. *** The defendant was very carefully Mirandized. He did agree[ ] to speak with the detective and with the DJO or Detective Borowczyk present. *** The officers did immediately contact the defendant's mom. The mom is there within one half-hour. Detective Borowczyk immediately comes back, says your mom is present, do you want her to come back and the defendant indicates at that time that he does not want her present. She's then there the balance of the day and she's present for the majority of the interview. Whether it's her or her mother who was also present much later in the day. Again, as the State points out, this one factor amongst many factors that the court is supposed to consider. *** There are not any threats towards the minor, there's no physical abuse towards the minor. In my mind, there was some somewhat coercive statements made by Detective Kaylor in that he repeatedly implored him to tell the truth: Do you want to be a witness or the defendant, do you want to get cuffed, or do you want to go home. But there were no specific promises of leniency based on the defendant's making statements. *** The interrogation or interview was lengthy, but questioning itself was only about two and one half-hours in length. There were numerous breaks. The defendant was allowed to use the bathroom. He's taken for the

car ride where they drove by one of the other defendant's house. He's brought food. His mom is in, his grandma is in, his sister is in. He's able to use a cell phone. Again, its lengthy, but there were a lot of breaks. It's not like they're staring at the defendant for 14 hours straight overcoming his will. *** And lastly, I think this last point is important, I think [defendant] wanted to make a statement to the police officer on that particular day."

¶ 15 The trial court recapped its findings and conclusion by saying, "in terms of the minor's statement, I certainly can't find that the minor's will was overcome and I certainly can't find that the statement was involuntary."

¶ 16 Defendant's case proceeded to a bench trial on July 23, 2019. The State presented testimony from six witnesses. Joyce Owens, Britney and Cesley's neighbor, testified about what she heard during the robbery and Britney knocking on her door afterwards.

¶ 17 Cline testified he previously entered into a plea agreement whereby he would plead guilty to one count of first degree murder and testify truthfully in defendant's case and, in exchange, he would receive a 20-year sentence in DOC. Cline testified he and Darion planned the robbery. He testified he told defendant about the plan and defendant "said he wanted to come, too. He just wanted to be cut in." Cline stated the plan changed when defendant joined the group. Now the plan was to drop off defendant at Cesley's apartment, and he would text them when it was time to come in. Cline testified defendant initially texted him not to come in because Britney was in the living room, but he texted him to come in once Britney went to the bedroom. He then recounted the events of the robbery and shooting. Cline testified defendant went along with the plan, pretending he was also being robbed. He stated defendant took Cesley's shoes, iPhone, and charger from the apartment. He also said defendant received a share of the $40 taken during the robbery.

¶ 18 The State next called Britney. She testified to her recollections and observations from the robbery and shooting. She confirmed Cesley expected to shoot dice with defendant and Cline the night of September 7, 2015. She testified defendant entered the apartment with her and Cesley. Britney testified the cell phone she shared with Cesley was missing after the robbery. The State's next witness was Austin Lewis, the Decatur police officer who first responded to the scene. He described his observations of Britney, the apartment, and Cesley's body.

¶ 19 The State then called Borowczyk, who testified he was assigned to conduct forensic examinations on the contents of defendant's cell phones. He stated he prepared a report documenting defendant's texts and communications with Cesley and Britney's shared cell phone. He likewise prepared a report documenting defendant's texts and communications with Cline and testified to the texts and messages on those reports. The State's next witness was Kaylor. He testified defendant's time at the police station on September 8 and 9, 2015, was video recorded from approximately 10:53 a.m. on September 7, to 2:57 a.m. on September 8. Kaylor identified and provided the foundation for the juvenile custodial interview advice form that defendant signed along with the DVDs of defendant's interrogation. With Kaylor still on the stand, the State played a video of defendant's interrogation. The final evidence the State presented was stipulations it reached with the defense relating to Britney's injuries and medical treatment, ballistics testing, crime-scene processing, Cesley's cause of death, Cesley's autopsy, defendant's detention, gun residue testing, and DNA testing.

¶ 20 The bench trial resumed on August 29, 2019. The defense moved for directed verdicts on the three first degree murder counts and the one attempt (murder) count, arguing neither

defendant nor his cohorts had the requisite intent to commit murder. The trial court heard arguments and asked questions of both sides. Following a brief recess, the trial court rendered its decision on the record, granting defendant's motion for directed verdicts, and entered a judgment of acquittal on those counts. The trial then proceeded to defendant's case.

¶ 21       The defense called Tyris Wilson, who testified he could not recall his September 22, 2015, interview with Decatur police where he said he sold a gun to Cline, Evans, and Cook for $100. Wilson testified he had pending charges and was previously adjudicated a delinquent minor in Macon County case No. 15-JD-164 for selling a firearm to a minor. After admitting a stipulation relating to Cline's interview with police, the defense rested. The trial court ultimately found "the evidence is sufficient to prove the defendant guilty beyond a reasonable doubt" of the remaining three counts—one count of felony murder and two counts of armed robbery.

¶ 22       Defendant filed a motion to reconsider the verdicts or for a new trial. Defendant's motion levied several arguments, including (1) the trial court erred in denying the suppression motion, (2) the trial court erred in limiting the defense's cross-examination of Borowczyk, and (3) the State presented insufficient evidence to prove defendant guilty beyond a reasonable doubt of each offense and the firearm enhancement. On October 19, 2019, after brief arguments from counsel, the trial court denied the motion and proceeded to sentencing.

¶ 23       At sentencing, the trial court heard testimony from defendant's mother and grandmother. Defendant's mother testified about defendant's childhood, friends, and participation in sports. She stated defendant was a good student, earning As, Bs, and Cs. The trial court read victim impact statements as well as letters supporting defendant. Defendant opted to make a statement in allocution in which he apologized to Cesley's family and to Britney, and he asked the court for leniency. The State recommended a 35-year sentence—20 years on the felony murder count and 15 years on the firearm enhancement. The defense asked the trial court not to impose the firearm enhancement and then asked for the minimum sentence available, 20 years.

¶ 24       In rendering its decision, the trial court declined to impose the firearm enhancement. Saying, "[t]his is obviously a tragic, tragic case," the trial court then outlined its sentencing considerations. The court noted defendant's young age, 16 at the time of the offense and 20 years old at sentencing. The court labeled defendant's crimes as "grave, grave offenses." It noted the suffering defendant caused to Cesley's family and to Britney. The trial court then considered the following mitigating factors: defendant had no prior criminal record, defendant's age did not allow him to understand the consequences of his actions, defendant was a good student, he was involved in sports, he was a normal 16-year-old before this incident, and he was very respectful in court. The trial court found defendant similarly situated to Cline, even though "Cline's level of participation was greater" and "he's more culpable." The trial court noted it found Cline's testimony credible. It further noted Cline cooperated and pleaded guilty. The trial court observed, "defendant exercised his constitutional right to have a trial in front the Court. I don't believe that's anything I can hold against the defendant." The court noted Evans, the shooter, pleaded guilty and received a 45-year sentence. Noting all this, the trial court concluded: "So on balance, I don't believe a minimum sentence is appropriate. I also do not believe 35 years is appropriate." It sentenced defendant to 24 years in DOC on the felony murder count and 10 years in DOC on the armed robbery counts, followed by 3 years' MSR.

¶ 25     On November 12, 2019, defendant moved to reconsider or reduce his sentence, arguing (1) the trial court should have vacated the armed robbery convictions under the "one-act, one-crime" rule, (2) defendant received a disproportionate sentence compared to Cline, (3) defendant was punished for exercising his right to a trial, and (4) the trial court failed to consider all statutory factors in mitigation. At a December 10, 2019, hearing, the trial court granted defendant's motion in part. Finding the armed robbery counts merged with the felony murder count pursuant to the one-act, one-crime rule, the trial court vacated the 10-year armed robbery sentence and denied the balance of defendant's motion, noting defendant's sentence was not disproportionate to Cline's and it properly considered the mitigating factors.

¶ 26     This appeal followed.

¶ 27                                        II. ANALYSIS

¶ 28     Defendant challenges his conviction and sentence on three grounds: (1) the trial court erred in denying defendant's motion to suppress his statements to police, (2) Illinois's felony murder statute is unconstitutional as applied to defendant, and (3) the trial court abused its discretion in sentencing defendant to 24 years in DOC while a similarly situated defendant received a 20-year sentence. We disagree and affirm.

¶ 29                                 A. The Motion to Suppress

¶ 30     When presented with an appeal from a trial court's ruling on a suppression motion, we apply a two-part test. *People v. Woods*, 2013 IL App (4th) 120372, ¶ 20, 995 N.E.2d 539. We review the trial court's factual findings under the deferential manifest-weight-of-the-evidence standard, rejecting them only if they are unreasonable, arbitrary, or contrary to the evidence. *Woods*, 2013 IL App (4th) 120372, ¶ 20. However, we review *de novo* the trial court's ultimate legal conclusion, *i.e.*, whether those established facts amount to a constitutional violation warranting suppression of the evidence. *Woods*, 2013 IL App (4th) 120372, ¶ 20.

¶ 31     Defendant presents a twofold argument why the trial court erred in denying his motion to suppress his statements to police. He first argues he did not voluntarily, knowingly, or intelligently waive *Miranda*; therefore, his statements should have been suppressed. Second, citing various circumstances surrounding his interrogation, he argues his statements were involuntary and should have been suppressed. We take each argument in turn.

¶ 32                          1. *Knowing, Intelligent* Miranda *Waiver*

¶ 33     Because "[c]ustodial interrogation is *** inherently coercive and trades on the weakness of individuals" (internal quotation marks omitted) (*People v. Braggs*, 209 Ill. 2d 492, 513, 810 N.E.2d 472, 486 (2003)), the law requires that criminal suspects be apprised of their constitutional rights to silence and to counsel, colloquially known as *Miranda* rights. See *Miranda*, 384 U.S. at 444. When a suspect decides to waive *Miranda* rights and speak to police without an attorney present, the waiver must be a voluntary, knowing, and intelligent act, meaning the suspect has "sufficient awareness of the relevant circumstances and likely consequences." *Braggs*, 209 Ill. 2d at 514-15. Our supreme court has said, "[a] criminal suspect is not required to know and understand every possible consequence of *** waiv[ing] [*Miranda* rights] for it to be knowingly and intelligently [done]." *Braggs*, 209 Ill. 2d at 515. Instead, for a voluntary, knowing, and intelligent waiver of *Miranda* rights, "the [suspect] must at least

understand basically what those rights encompass and minimally what their waiver will entail." *Braggs*, 209 Ill. 2d at 515.

¶ 34 Because juveniles are some of the most vulnerable members of our society, "[t]he greatest care must be taken to assure" (1) a juvenile validly waived *Miranda* and (2) the "incriminating statement was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re W.C.*, 167 Ill. 2d 307, 328, 657 N.E.2d 908, 919 (1995). Accordingly, when presented with questions of "whether an accused [juvenile] knowingly and intelligently waived his rights," we must (1) evaluate "the words in the context used, considering the age, background and intelligence of the [juvenile] being interrogated" and (2) determine whether those words, spoken in those circumstances, "impart[ed] a clear understandable warning of all of his rights." *W.C.*, 167 Ill. 2d at 329.

¶ 35 Citing his age (16 at the time of interrogation) and inexperience, defendant contends "the record shows [he] was not fully aware of the nature of the rights he waived and the ramifications of his decision." He then goes on to cite secondary sources he did not present to the trial court to support that argument. In doing so, defendant essentially asks us to presume he did not understand his rights or what it meant to waive them based on his age and lack of criminal history. When looking at this record, however, we see defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

¶ 36 The record contains the video recordings from defendant's interrogation. The video shows Kaylor read defendant the *Miranda* warnings from a form labeled "Custodial Interview Advice Juvenile." Kaylor said he wanted to talk to defendant "about a couple things, but before I do that I gotta [*sic*] read these to you and you can read along. Can you read?" Defendant answered, "[Y]eah," and the following occurred:

"KAYLOR: You do not have to make any statement at this time, and you have the right to remain silent. Does that make sense to you?

DEFENDANT: (affirming) Mm-hmm.

KAYLOR: Anything that you say can and will be used against you in a court of law. Do you understand that?

DEFENDANT: (affirming) Mm-hmm.

KAYLOR: You are entitled to an attorney before any interview and to have an attorney present at the interview. Does that make sense?

DEFENDANT: (affirming) Mm-hmm.

KAYLOR: If you cannot afford an attorney, one will be appointed for you. I understand that being 13 years of age or older, I can be prosecuted as an adult. The above rights have been read to me and by me, and I fully understand those rights. Understanding the above rights, I do agree to speak with the officer or officers interviewing me. Does that make sense?

DEFENDANT: (affirming) Mm-hmm.

KAYLOR: (indicating on form) Can I get you to initial here and sign?

DEFENDANT: Put my initials right here? (pointing on form)

KAYLOR: Yep. That's just saying that you understand each one of those, that they've been read, you've read 'em [*sic*].

DEFENDANT: Sign right here too? (indicating on form)

KAYLOR: What's that?

DEFENDANT: Sign right here too? (pointing on form)

KAYLOR: Yes, please."

Defendant initialed next to each *Miranda* warning and signed the advisement form.

¶ 37 Considering the words used in this context, and considering defendants age (almost 17), background, and intelligence (he was a good student), we find the words and circumstances imparted to defendant "a clear understandable warning of all of his rights." *W.C.*, 167 Ill. 2d at 329. After watching the video, we agree with the trial court's observation that "the defendant was very carefully Mirandized." There is no indication from the video or from the record on the whole that defendant was not "fully aware" of his rights or did not understand that he was waiving them. Defendant need not have a perfect or full understanding of his rights. Nor must he "understand far-reaching legal and strategic effects of waiving his *** rights." *Braggs*, 209 Ill. 2d at 515. Instead, defendant had to "understand basically what [*Miranda*] rights encompass and minimally what their waiver will entail." *Braggs*, 209 Ill. 2d at 515. The record confirms he did. Kaylor read defendant's rights from a standard advice form tailored for juveniles, and he made sure defendant followed along and understood. We reject the assumption that a defendant's youth *ipso facto* prevents him from understanding his rights or understanding what it means to waive those rights, especially when we have an intelligent, articulate, almost 17-year-old defendant like we have here. Defendant would have us, based on studies, research, and other writings never vetted before this trial court, unilaterally determine this defendant, and arguably, any teenage defendant, is incapable of giving a knowing and intelligent waiver of his rights. Looking at this particular defendant in these circumstances and the warnings he received, we conclude defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights and agreed to talk with police.

¶ 38                                    2. *Voluntary Statements*

¶ 39 If a defendant's "will was overcome at the time he or she confessed," then the statement was given involuntarily and should be suppressed. (Internal quotation marks omitted.) *In re G.O.*, 191 Ill. 2d 37, 54, 727 N.E.2d 1003, 1012 (2000). When evaluating whether a juvenile gave a statement voluntarily, "we must consider the totality of the circumstances," including the juvenile's "age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning." *G.O.*, 191 Ill. 2d at 54. The totality of the circumstances also includes factors like "the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, [especially] the existence of threats or promises." *G.O.*, 191 Ill. 2d at 54. Because we take great care in assuring juveniles' confessions are voluntarily given, there is an additional factor we consider, namely "the 'concerned adult' factor." *G.O.*, 191 Ill. 2d at 54-55. This final factor "considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare." *G.O.*, 191 Ill. 2d at 55. Though relevant to our evaluation of whether a juvenile gave a voluntary confession to police, the concerned-adult factor does not carry extra weight. See *G.O.*, 191 Ill. 2d at 55; *People v. Lee*, 335 Ill. App. 3d 659, 668, 781 N.E.2d 310, 318 (2002) ("The presence or absence of the parent is [one] factor in evaluating the voluntariness of a [juvenile's] statement or confession under the totality of the circumstances test." (Internal quotation marks omitted.)). Indeed "no single factor is dispositive" when evaluating whether a juvenile talked with police voluntarily. *G.O.*, 191 Ill. 2d at 54.

- 10 -

¶ 40    Defendant claims his statements to police should have been suppressed because the totality of the circumstances show he made them involuntarily. He argues his will was overborne because he did not have the benefit of consulting with a concerned adult, he was interrogated over a period of 13 hours, and Kaylor interrogated him using threats and promises of leniency. We will consider the totality of the circumstances surrounding defendant's statements to police, taking care to address these specific factors defendant highlights.

¶ 41    We note, first, that as part of its own totality of the circumstances analysis the trial court made factual findings relating to whether defendant gave voluntary statements to police. As to defendant's age and intelligence, the trial court found defendant was "almost 17-years of age," was "very articulate," and "appeared to be intelligent." The trial court observed the total time defendant spent in interrogation "was lengthy," but it found the "questioning itself was only about two and one half-hours in length." Regarding defendant's physical condition during questioning, the trial court found defendant received "numerous breaks," he "was allowed to use the bathroom," and "he[ ] was brought food." Relating to defendant's mental condition, the trial court found defendant was able to see his mother, grandmother, and sister, and he was able to use a cell phone. The trial court specifically found: "It's not like they're staring at defendant for 14 hours straight overcoming his will." We defer to these findings of fact, seeing how they are not unreasonable, arbitrary, or contrary to the evidence because they are verifiable from the video. See *Woods*, 2013 IL App (4th) 120372, ¶ 20.

¶ 42    From our own review of the video and the entire record, we find defendant did not lack mental capacity. He interacted with police appropriately and appeared to understand what was happening. We also note defendant was educated. Defendant's mother testified he was a good student and received As, Bs, and Cs. We note defendant had no criminal history and no experience with law enforcement; however, beyond asking where to initial on the advice of rights form, he exhibits no lack of understanding regarding his circumstances or the interrogation process itself.

¶ 43    In arguing his statements were given involuntarily, defendant focuses on two factors: he received threats and promises of leniency from Kaylor and he had no concerned adult present during questioning. We address each factor in turn.

                                    a. Threats or Promises of Leniency

¶ 44

¶ 45    As before, we begin with the trial court's findings, which noted, "there [were] somewhat coercive statements made by Kaylor in that he repeatedly implored him to tell the truth: Do you want to be a witness or the defendant, do you want to get cuffed, or do you want to go home." But the trial court ultimately found "there were no specific promises of leniency based on the defendant's making statements." We agree.

¶ 46    "To constitute an offer of leniency that renders a confession inadmissible, a police statement must be coupled with a suggestion of a specific benefit that will follow if the defendant confesses." (Internal quotation marks omitted.) *People v. Travis*, 2013 IL App (3d) 110170, ¶ 66, 985 N.E.2d 1019. Likewise, "mere exhortations to tell the truth are permissible absent a suggestion of a specific benefit to the individual being interrogated." *Travis*, 2013 IL App (3d) 110170, ¶ 66 (citing *People v. Wipfler*, 68 Ill. 2d 158, 173, 368 N.E.2d 870, 876 (1977)). It is evident from the video that Kaylor asked defendant if he wanted to be a witness or a defendant or if he wanted to go home or go to jail when trying to get defendant to tell him the truth about what happened inside Britney and Cesley's apartment. At no point, however,

did Kaylor link to defendant's statement a specific benefit like escaping prosecution or going home. When defendant asked Kaylor if he was going to jail, Kaylor responded either with silence or by saying that was not his decision to make. Kaylor explained people with higher rank than him would be deciding whether defendant would be charged. Tellingly, defendant saw through Kaylor's noncommittal answers. Once he admitted knowing Cline intended to rob the dice game, defendant, unprompted, said: "Oh my god, *** I'm fitt'n [*sic*] to go to jail." When Kaylor responded by saying "you are doing the right thing," defendant said, "No I'm not, cuz [*sic*] y'all going to take me to jail regardless." His current arguments notwithstanding, defendant fully understood what was going on. He felt the gravity of what he just admitted, and he knew Kaylor's assurances would not and could not save him.

¶ 47　　　We have thoroughly reviewed this record and find no instance of Kaylor promising defendant specific benefits in exchange for defendant's truthful statement. There can be no promises of leniency without suggestions of *specific* benefits to the accused. See *Travis*, 2013 IL App (3d) 110170, ¶ 66. To be sure, Kaylor exhorted defendant to tell the truth and told him the instant interview was his "one chance" or "his platform" to tell his story. Kaylor's exhortations included asking defendant to think about what he wanted—to be a defendant or witness, or to go home or to jail. But exhortations to tell the truth are allowed so long as the officer does not promise specific benefits to the accused. *Travis*, 2013 IL App (3d) 110170, ¶ 66. We conclude this factor does not "tilt[ ] the scale toward a finding that [defendant's] statement was involuntary."

¶ 48　　　　　　　　　　　　　　　　b. Concerned Adult

¶ 49　　　Defendant next highlights the concerned-adult factor, arguing he had no concerned adult present during questioning because his "mother was not allowed to confer with him before he made statements to police," and his DJO left after defendant was Mirandized. A concerned adult could be the juvenile's parent or a designated juvenile officer. Besides considering whether the juvenile had the benefit of consulting with an adult interested in his welfare before or during police questioning, the concerned-adult factor contemplates "whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the parents' attempt to confer with the juvenile." *G.O.*, 191 Ill. 2d at 55. But as we said *supra* ¶ 39, the concerned-adult factor does not carry more weight than any other factor considered in the totality of the circumstances. See *G.O.*, 191 Ill. 2d at 55. Accordingly, "a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation." *G.O.*, 191 Ill. 2d at 55; see also *Lee*, 335 Ill. App. 3d at 668 ("A juvenile does not have a *per se* right in Illinois to consult with a parent before questioning.").

¶ 50　　　We begin again with the trial court's findings. The trial court found that police "immediately contact[ed]" defendant's mother and she arrived at the police station "within one half-hour." The trial court noted it was defendant's decision not to have his mother sit in on the interview when she first arrived. Once defendant changed his mind and decided he wanted an adult present during questioning, either his mother or his grandmother were present during the interview. We defer to these findings because they are not contrary to the evidence. See *Woods*, 2013 IL App (4th) 120372, ¶ 20.

¶ 51　　　Indeed, the video shows that once defendant's mother arrived at the station, Borowczyk entered the interrogation room, looked at defendant, and said, "Your mother is here."

Defendant nodded his head up and down indicating he understood what Borowczyk said. Kaylor then asked defendant, "[D]o you want her in here?" Defendant answered by looking down and shaking his head side-to-side, indicating he did not want his mother present. Borowczyk then confirmed defendant's decision by asking, "No?" When defendant did not correct him, Borowczyk said "okay" and closed the door. Watching the video, we see defendant clearly indicated he did not want his mother in the room during questioning at that time.

¶ 52    Defendant asks us to discount what we saw and what the trial court found by arguing, "even though [he] shook his head indicating that he did not want his mother in the room, it did not mean he did not wish to confer with her before making any more statements." In supporting this position, defendant likens his case to *In re J.J.C.*, 294 Ill. App. 3d 227, 689 N.E.2d 1172 (1998). There, police apprehended J.J.C. in his home with his mother present. She insisted on going to the police station with her son, but police would not allow her to go with him. At the station, police read J.J.C. his rights from the juvenile warning form. When the officer read the admonition that a juvenile "could 'consult with his parents or legal guardian before questioning,' " 16-year-old J.J.C. said, " 'it's none of their f*** business.' " *J.J.C.*, 294 Ill. App. 3d at 229, 237. When J.J.C.'s parents arrived and asked to speak with their son, police did not allow them to see him. *J.J.C.*, 294 Ill. App. 3d at 231, 237. After reviewing the totality of the circumstances—including, the defendant's age, his learning disabilities, his psychiatric disorders, and police clearly frustrating his parents' attempts to talk with him before or during questioning—this court found the defendant's statements involuntary. *J.J.C.*, 294 Ill. App. 3d at 238. In doing so, it held: "when a juvenile's parents are present, request to confer with their child, and are effectively refused by the law enforcement authorities, the presumption arises that the juvenile's will is overborne." *J.J.C.*, 294 Ill. App. 3d at 237. Defendant argues *J.J.C.*'s holding, particularly the presumption his will was overborne, applies squarely to his case. We disagree.

¶ 53    There are factual differences between this case and *J.J.C.* Unlike J.J.C., defendant here was informed his mother was present, asked directly if he wanted her in the interrogation room, and unambiguously declined to have his mother in the room. J.J.C., on the other hand, made his statement that his situation was none of his parents' business when being read the general admonition that he *could* consult with his parents, not when being told they were present and asked directly if he wanted to consult with them. More importantly, though, there is no evidence the police here clearly frustrated defendant's mother's efforts to confer with her son. Borowczyk immediately told defendant his mother was present and Kaylor asked him if he wanted her to be present. Defendant clearly indicated he did not. But once he changed his mind, police allowed defendant's mother in the room during questioning. In *J.J.C.*, there is no indication police informed the defendant his parents were present and wanted to speak with him. And by contrast, there is evidence in *J.J.C.* that police frustrated the mother's attempt to accompany her son to the police station and remain with him. There is no such evidence here. Since the record does not show law enforcement frustrated defendant's mother's efforts to see her son but shows instead that defendant refused to have his mother present during questioning, we decline to presume defendant's will was overborne. It was his decision not to have his mother present during questioning. He refused her entry, not the police.

¶ 54    Defendant had the benefit of a DJO, Borowczyk, who was present at the beginning of the interview. The video recording begins with defendant and Borowczyk in the interrogation

- 13 -

room. Borowczyk is getting defendant's mother's contact information so he can inform her of defendant's whereabouts. He then leaves defendant alone in the room before returning in about five minutes with Kaylor. Borowczyk introduced defendant to Kaylor and sat there observing defendant while Kaylor Mirandized defendant. Borowczyk next told defendant, while maintaining eye contact with him, "If you have any questions or anything like that while, uh, Detective Kaylor is talking to you, just let him know and he can come get me, okay?" Defendant nodded, indicating he understood. Borowczyk exited and did not return until he informed defendant his mother was present. The video does not show defendant asking to consult with Borowczyk. Besides acting as defendant's DJO, Borowczyk was assigned other tasks in the department's investigation into Cesley's murder, namely cell phone data extractions and contacting a witness's mother.

¶ 55       Defendant maintains that "while Borowczyk was supposed to be acting as [defendant's DJO], he was actively engaged in the investigation against him, which 'contributed to the coercive atmosphere surrounding' [defendant's] statements." He also argues his DJO (Borowczyk) should have remained in the interrogation room during the interview. Defendant's arguments rest upon *People v. Griffin*, 327 Ill. App. 3d 538, 548-49, 763 N.E.2d 880, 889 (2002), where this court held a juvenile's DJO "was not an adult concerned for defendant's welfare" and determined the totality of the circumstances dictated the juvenile's confession was involuntary. There, the DJO was acting as a youth officer to seven juveniles at once. The DJO was actively investigating Griffin's case in that he Mirandized and interrogated several witnesses and executed search warrants. *Griffin*, 327 Ill. App. 3d at 548.

¶ 56       Contrary to defendant's view, Borowczyk's other assigned tasks in this matter do not amount to him "actively investigating" the case against defendant. Unlike the *Griffin* DJO, Borowczyk did not interview, let alone interrogate, other witnesses. He merely obtained from a nondefendant witness her mother's contact information and then contacted the mother. We cannot liken Borowczyk conducting data extractions from cell phones *after* he acted as defendant's DJO to the *Griffin* DJO executing search warrants in the same case while acting as a DJO. Borowczyk testified he "had data extractions pending" but "[t]hey had not been started" when he acted as defendant's DJO. The trial court likewise distinguished this case from *Griffin* when it concluded that Borowczyk's "examining the cell phones" was "separate and apart from the questioning part of this case" and did not equate to "actively participating in the questioning part of the investigation." Though we are not bound by the trial court's conclusion, we agree with it—*Griffin* is distinguishable and not controlling here. As a final matter, we note defendant's point that Borowczyk was not present during the questioning is confirmed by the video. However, "there is no requirement that a juvenile officer be present when a minor is questioned, and the absence of a juvenile officer will not make a juvenile's statements *per se* involuntary." *People v. Murdock*, 2012 IL 112362, ¶ 52, 979 N.E.2d 74. Borowczyk fulfilled his role as DJO by ensuring defendant was properly Mirandized and that defendant understood his rights. In fact, he went further by clearly informing defendant that if he had any questions during the interview, Borowczyk was available for him.

¶ 57       Having no criminal background or experience, defendant found himself for the first time in an inherently coercive situation, *i.e.*, custodial interrogation. Nevertheless, the totality of the circumstances surrounding defendant's interrogation signal he made his statements to police voluntarily. There is no dispute defendant was legally detained. As a juvenile, he had the benefit of a DJO before the interrogation. By his own choice he did not have his mother present

during some of the questioning, but he did have either his mother or grandmother present during much of the interview. Defendant was 16 years old, but only four months shy of his seventeenth birthday. He was educated, intelligent, and a good student. Over the span of 13-plus hours at the police station, he was allowed to eat, use the restroom, use his mother's and grandmother's cell phones, and take breaks during questioning. He was briefly handcuffed and shackled when he left the station with police to identify his cohort's house. Otherwise, he was not restrained during the interrogation. Defendant showed sound mental capacity—he understood what was going on, what was being said to him, and he responded appropriately. All told, we conclude defendant's will was not overborne during the interview, meaning he made statements to police voluntarily.

¶ 58                                          B. The Felony Murder Statute

¶ 59        Defendant contends Illinois's felony murder statute is unconstitutional when used to prosecute juveniles. We review defendant's constitutional claim *de novo*. *People v. Madrigal*, 241 Ill. 2d 463, 466, 948 N.E.2d 591, 593 (2011).

¶ 60        "We presume statutes are constitutional" (*People v. Pacheco*, 2013 IL App (4th) 110409, ¶ 48, 991 N.E.2d 896), which means "court[s] will uphold statutes whenever reasonably possible, resolving all doubts in favor of their validity" (*People v. Pepitone*, 2018 IL 122034, ¶ 12, 106 N.E.3d 984). The party challenging a statute as unconstitutional can rebut the presumption, but it "must establish clearly that [the statute] violates the constitution." *Pepitone*, 2018 IL 122034, ¶ 12.

¶ 61        Though citing eighth amendment case law, defendant brings a substantive due process claim, arguing that when applied to him (a juvenile), the felony murder statute violates due process because it does not take into account his age. "When the challenged statute does not affect a fundamental constitutional right," and defendant concedes the felony murder statute does not affect a fundamental right, "the appropriate test for determining its constitutionality is the highly deferential rational basis test." *Madrigal*, 241 Ill. 2d at 466. This is a two-part test, determining, first, "whether there is a legitimate state interest behind the [statute], and [second], whether there is a reasonable relationship between that interest and the means the legislature has chosen to pursue it." (Internal quotation marks omitted.) *Pepitone*, 2018 IL 122034, ¶ 14. So we turn our attention to the statute and the state's interest behind it.

¶ 62        The felony murder statute can be found at section 9-1(a)(3) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(3) (West 2014)) and provides: "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death *** he [or she] is attempting or committing a forcible felony other than second degree murder." Our supreme court has explained that "[t]he object of the felony murder statute is to limit the violence that attends the commission of felonies." *People v. Shaw*, 186 Ill. 2d 301, 322, 713 N.E.2d 1161, 1172-73 (1998). The state's chief aim at limiting violence expresses two more specific state interests. First, the felony murder statute "reflects the legislature's concern for protecting the general populace." *People v. Lowery*, 178 Ill. 2d 462, 469, 687 N.E.2d 973, 977 (1997). Second, "[f]elony murder seeks to deter persons from committing forcible felonies by holding them responsible for murder if a death results." *People v. Dennis*, 181 Ill. 2d 87, 105, 692 N.E.2d 325, 335 (1998).

¶ 63        Defendant does not challenge the state's legitimate interests in protecting the public and deterring violent crime. Instead, he jumps to step two in the rational basis test. He argues that

applying the felony statute to him (a juvenile) does not reasonably relate to the state's interests. Ignoring the state's interest of protecting innocent people from violent crime, defendant focuses on deterrence, maintaining a juvenile cannot be deterred from crime because "[a]s a group, juveniles lack the cognitive and neurological development to be deterred by the fear of prosecution for first degree murder." He relies upon a trilogy of United States Supreme Court precedent—*Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012)—where the Court held the eighth amendment's prohibition on cruel and unusual punishments proscribes death or mandatory life without parole sentences for juveniles, even juveniles who commit murder. According to defendant, those decisions "recogni[zed] that there are neurological and cognitive characteristics in juveniles that affect their choices and decision making" and "it is now well-recognized *** that juveniles exhibit 'immaturity, impetuosity, and failure to appreciate risks and consequences' " (quoting *Miller*, 567 U.S. at 477). He urges us to extend the rationale undergirding *Roper*, *Graham*, and *Miller* from the eighth amendment context to a fourteenth amendment context—which we have previously refused to do.

¶ 64    In *Pacheco*, the defendant, invoking *Roper* and its progeny, challenged the automatic transfer statute on substantive and procedural due process grounds. We rejected the defendant's argument, noting we could not apply eighth amendment rationale to fourteenth amendment claims. We explained, "*Roper* and *Graham* did not consider due process arguments and [we] found those cases distinguishable because each 'applied (1) a different analysis (2) under a different test for (3) an alleged violation of a different constitutional provision regarding severe sentencing sanctions.' " *Pacheco*, 2013 IL App (4th) 110409, ¶ 63 (quoting *People v. Croom*, 2012 IL App (4th) 100932, ¶ 16, 975 N.E.2d 1107). Though defendant challenges the felony murder statute and not the automatic transfer statute, we reject his argument on the same grounds we rejected Pacheco's argument. *Roper* and its progeny simply do not apply here. We will not transplant rationale supporting eighth amendment principles governing sentencing to this fourteenth amendment claim.

¶ 65    Anticipating we would respond here like we did in *Pacheco*, defendant also cited several secondary sources to support his contention that "[b]ecause of their cognitive and neurological characteristics, juveniles simply cannot make the kind of long-term risk considerations that would be required in order for them to be deterred by the possibility of prosecution for felony murder." Defendant "asks this Court to apply newly developed scientific facts, including those accepted by the United States Supreme Court, in *Roper*, *Graham*, and *Miller* to determine the rational basis of a form of criminal liability as applied to juveniles." There are no scientific facts before us, though, since defendant did not present this argument or these sources to the trial court. Even if defendant's sources contain "scientific facts," we echo our supreme court's admonition in *Pepitone*: "The problem for the defendant is that, regardless of how convincing that social science may be, 'the legislature is in a better position than the judiciary to gather and evaluate data bearing on complex problems.' " *Pepitone*, 2018 IL 122034, ¶ 24 (quoting *People v. Minnis*, 2016 IL 119563, ¶ 41, 67 N.E.3d 272).

¶ 66    Defendant has not met his burden in rebutting our presumption that the felony murder statute is constitutional. He did not clearly establish factually or legally that applying the felony murder statute to him violates substantive due process. Specifically, we hold the felony murder statute bears a reasonable relationship to deterring crime and protecting the public, even when applied to juveniles, and particularly this defendant.

¶ 67                                    C. Sentencing

¶ 68        In his final argument, defendant contends the trial court abused its discretion in sentencing him to 24 years while his cohort, Cline, who the court opined was more culpable, received a 20-year sentence pursuant to a plea agreement. Defendant reasons the disparity between his sentence and Cline's proves he was penalized for exercising his constitutional right to trial. We disagree.

¶ 69        " '[T]he trial court has broad discretionary powers in imposing a sentence [citation], and the trial court's sentencing decision is entitled to great deference [citation].' " *People v. Scott*, 2012 IL App (4th) 100304, ¶ 23, 966 N.E.2d 340 (quoting *People v. Stacey*, 193 Ill. 2d 203, 209, 737 N.E.2d 626, 629 (2000)). We, therefore, will not disturb the trial court's sentencing decision " 'absent an abuse of discretion.' " *Scott*, 2012 IL App (4th) 100304, ¶ 23 (quoting *Stacey*, 193 Ill. 2d at 209-10). A trial court abuses its discretion when its " 'decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *People v. McGath*, 2017 IL App (4th) 150608, ¶ 55, 83 N.E.3d 671 (quoting *People v. McDonald*, 2016 IL 118882, ¶ 32, 77 N.E.3d 26). By way of example, an " '[a]rbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible' " as it represents an abuse of discretion. *Scott*, 2012 IL App (4th) 100304, ¶ 24 (quoting *People v. Caballero*, 179 Ill. 2d 205, 216, 688 N.E.2d 658, 663 (1997)). A trial court likewise abuses its discretion if the sentence "was, at least in part, imposed because the defendant had refused to plead guilty but had instead availed himself of his constitutional right to trial." *People v. Ward*, 113 Ill. 2d 516, 526, 499 N.E.2d 422, 425 (1986).

¶ 70        Though defendant claims he is not comparing his sentence to Cline's, we note that in the span of two paragraphs in the appellant's brief he wrote at least four times some variation of the phrase he received "an additional four years in prison" compared to Cline. He also argued he received a "higher sentence." Despite defendant's protests, we see his argument as twofold: (1) there is an unreasonable and arbitrary disparity between his sentence and Cline's and (2) the trial court penalized defendant for exercising his trial right. We will address each argument.

¶ 71        There is no arbitrary or unreasonable disparity between defendant's and Cline's sentences. We note, first, that "[i]n general, '[a] sentence imposed on a codefendant who pleaded guilty as part of a plea agreement does not provide a valid basis of comparison to a sentence entered after a trial.' " *Scott*, 2012 IL App (4th) 100304, ¶ 25 (quoting *Caballero*, 179 Ill. 2d at 217). A trial court functions differently when it ratifies a plea agreement compared to sentencing a defendant after presiding over a trial. See *Scott*, 2012 IL App (4th) 100304, ¶ 25 ("[A] trial court's determination whether to ratify a plea agreement struck through negotiations between a defendant and the State differs qualitatively from its finding of an appropriate sentence following a trial and a sentencing hearing."). The determinations and concomitant considerations are different. For example, " 'a trial court may properly grant leniency to the defendant who pleads guilty and thereby insures prompt and certain application of correctional measures, acknowledges his guilt, and demonstrates a willingness to assume responsibility for his conduct.' " *Scott*, 2012 IL App (4th) 100304, ¶ 25 (quoting *People v. Foster*, 199 Ill. App. 3d 372, 393, 556 N.E.2d 1289, 1303 (1990)).

¶ 72        For these reasons, Cline's 20-year sentence does not serve as a valid comparison to defendant's 24-year sentence. It appears to us Cline received leniency in exchange for his guilty plea and cooperation with the State, which does not make defendant's sentence arbitrarily or unreasonably disparate. See *Caballero*, 179 Ill. 2d at 218 (stating "dispositional

- 17 -

concessions are properly granted to defendants who plead guilty"). Our supreme court outlined three reasons why a codefendant who pleads guilty might receive a lesser sentence compared to a codefendant who goes to trial: (1) he "acknowledged his guilt and showed willingness to assume responsibility for his conduct," (2) he "made a public trial unnecessary," and (3) he cooperated, "which resulted in the successful prosecution of another offender engaged in equally serious or more serious criminal conduct." *Caballero*, 179 Ill. 2d at 218. These three reasons apply to Cline, which explains why he received a 20-year sentence even though he is the one who planned the robbery and recruited Evans, Cook, and defendant. Cline's and defendant's sentences are separate matters. There are reasons why Cline received a 20-year sentence that are unrelated to defendant. The fact Cline received leniency for pleading guilty and cooperating with the State does not mean defendant received an arbitrarily or unreasonably disparate sentence.

¶ 73 Likewise, the record shows the trial court did not penalize defendant for exercising his constitutional right to a trial. We judge whether a trial court imposed a trial tax by evaluating the court's remarks to discern if "the punishment was, at least in part, imposed because the defendant *** availed himself of his constitutional right to trial" rather than pleading guilty. *Ward*, 113 Ill. 2d at 526. It is true, the trial court found defendant similarly situated to Cline, but it then opined Cline was "more culpable." The record further shows the court referenced Cline's plea agreement and remarked, "defendant exercised his constitutional right to have a trial." However, the trial court immediately stated, "I don't believe that's anything I can hold against the defendant." Defendant's argument notwithstanding, these remarks do not make it "clearly evident" the trial court imposed on him a four-year trial tax.

¶ 74 To the contrary, the record shows defendant's 24-year sentence was a reasonable sentence. Besides commenting on Cline's sentence and guilty plea, the trial court documented its reasoning for the 24-year sentence on the record. It twice noted the gravity and seriousness of defendant's crime. The trial court noted the suffering defendant's crime caused to Britney and to Cesley's family. Yet the court also noted defendant's young age, his lack of criminal history, his good academic record, and his participation in sports. In sum, the record confirms the trial court balanced several factors when deciding on an appropriate sentence. It did not impose a trial tax by penalizing defendant for exercising his right to a trial. In our view, the trial court showed defendant some leniency by sentencing him to the low end of the sentencing range (20 to 40 years) and not imposing the 15-year firearm enhancement. We, therefore, hold the trial court did not abuse its discretion in sentencing defendant to 24 years in DOC.

¶ 75 III. CONCLUSION

¶ 76 For the reasons stated, we affirm the trial court's judgment.

¶ 77 Affirmed.